### CHICAGO AND ERIE RAILROAD COMPANY v. THOMAS, ADMINISTRATOR.

[No. 18,425. Filed December 19, 1900.]

PLEADING.— *Death by Wrongful Act.—Action.—Complaint.— Railroads.*—A complaint against a railroad company for damages for the death of plaintiff's decedent is not bad on demurrer for failing to allege that actual damages were sustained, where the complaint alleged that decedent left surviving him his wife and an infant son. *p. 635.*

RAILROADS.— *Injury at Crossing.*— *Contributory Negligence.*— One who attempts to drive over a railway crossing without looking for approaching trains is guilty of contributory negligence, although the view was so obstructed that he could not see approaching trains without going in advance of his team; and the fact that the persons in charge of a train approaching the crossing failed to sound the whistle and ring the bell, as required by law; did not excuse him from the exercise of the caution and vigilance demanded by the known perils of the crossing. *pp. 635-640.*

From the Huntington Circuit Court. *Reversed.*

*W. O. Johnson, J. B. Kenner* and *U. S. Lesh,* for appellant.

*J. S. Dailey, A. Simmons, F. C. Dailey* and *Branyan & Branyan,* for appellee.

DOWLING, C. J. —Action for damages for the alleged wrongful killing of appellee's decedent, James L. Platt, at a street crossing on appellant's railroad in the town of Markle.

The complaint is in two paragraphs, to each of which a demurrer was overruled. Trial upon the general issue, general verdict for the plaintiff, and answers to 120 interrogatories. Appellant's motion for judgment upon the answers to interrogatories, notwithstanding the general verdict, was overruled, as was also its motion for a new trial. The action of the court upon the demurrers to the complaint, and upon the several motions, is assigned for error.

The only objection to the complaint pointed out by appellant is the absence from each paragraph of an averment that actual damages were sustained by the death of Platt. Each paragraph of the complaint avers that the decedent left surviving him Alice Platt, his widow, and Fon Platt, a son aged one year, and that both are living. The legal presumption is that both the widow and infant child were entitled to the services of the deceased, and that such services were valuable to both. Such a presumption is sufficient to sustain a complaint against a demurrer which confesses the truth of the averments. *Korrady* v. *Lake Shore, etc., Co.,* 131 Ind. 261.

It is next insisted that the court erred in overruling appellant's motion for judgment upon the answers to interrogatories for the reason that the facts disclosed by the answers are such as to require the court to rule, as a matter of law, that the deceased was guilty of contributory negligence.

The following facts are disclosed by the answers to interrogatories: The deceased was about twenty-five years of age. He was killed January 14, 1892. During his whole life he had lived four and a half miles north of Markle, which lies on the south side of appellant's tracks, and he had visited the town on an average of once a week during the last three years of his life. On the day of the accident, he was hauling logs from a point north of the tracks to a mill south of them. He hauled one load in the forenoon of that day, crossing the tracks on Lee street, and after unloading, he returned by the same route. In the afternoon, he crossed at the same point with a second load, and was going to his home by the same way when he was killed. He was using a team of horses hitched to a sled constructed of two planks for runners, curved in front, and held in place by benches connecting the runners, and acting as bolsters. The sled was fourteen inches high from the bottom of the runners to the top of the benches, and the decedent was seated on the forward bench, driving his team north on Lee street, at the time he was killed by a west-bound train on the main track. At the time of the accident, the appellant maintained tracks across Lee street as follows: (1) The main track; (2) north of, and fourteen feet from it, a side-track; (3) north of that, and fourteen feet from it, a second side-track, and (4) south of the main track, and from twenty to thirty feet from it, a third side-track. The space between the main track and the south siding was slightly wider east of the street than at its intersection, and this space was free from obstructions for the distance of 120 feet east of the street, at which point the space was thirty-two feet wide; a pile of lumber was there, the north end of which was twenty

feet from the main track, composed of boards twelve to four-teen feet in length—the ends to the track—the pile being from ten to fourteen feet high.   To the east of this, and between said tracks, there were other lumber piles, all nearer the side than the main track, and so placed for con-venient loading on the cars.   Immediately east of the east line of the street, and south of the side-track, with its north edge as near as it could be placed so as to admit the passage of cars, was a lumber dock, extending eastward along the track 120 feet, forty feet wide from north to south, and about as high as the floor of an ordinary freight car, upon which, at various points, were piled two or three car loads of lumber.   Standing on the side-track, just north of the lumber dock, was a freight car, the west end of which was from eight to ten feet east of Lee street.   Immediately south of the lumber dock, and connected therewith by a runway, on the east line of Lee street, was Fee's sawmill, two stories high, and 100 feet long, north and south, which was running at the time of the accident.   There was a mill on the south side of the tracks, known as Wilkinson's, the west line of which was about 230 feet east of Leè street. For some time before, and at the time of the accident, there was, on the first siding north of the main track, and west of the street, an engine headed west, with twelve or fourteen freight cars attached, the easternmost part of which was near the west line of the street, the train to which they be-longed having been cut or divided at the crossing, leaving a part of its cars east of the crossing, and the rest, with the engine attached, west of the street.   This train was lying on the siding, awaiting the passage of train number five, which last named train caused the death of the decedent.

At the time of the accident, the decedent's eyesight was good, and his organs of hearing were of ordinary acuteness. Having discharged his last load, Platt drove northward on Lee street to a point twenty or thirty feet south of the south siding where he stopped and held a conversation with some one.   He remained seated on the front bench of his

sled. From that point, he could not have seen a train approaching from the east in time to have started thence and crossed the main track before such train, running at the usual rate of speed, would have reached Lee street; nor could he from that point have seen such train at all until it reached the street. As soon as the conversation ended, he started and drove directly north on the street until the collision occurred, which was about 5 o'clock in the evening. The weather was cold, some snow was falling, and the wind was blowing from the west. Those in charge of the locomotive, drawing train number five, did not, when such locomotive was not less than eighty nor more than 100 rods from Lee street, distinctly sound the whistle three times, nor continuously ring the bell of the locomotive until said locomotive had passed the crossing of Lee street.

Some of the interrogatories, and the answers thereto, are as follows: "If said Platt, in passing over the tracks on the occasion of the accident, had looked eastward from a point in the center of the space, between the main and south side-track, on Lee street, could he have seen a train approaching from the east far enough to have avoided the accident by remaining where he was until it had passed? Answer. No."

"Did Platt, while on his way across the tracks on the day of the accident, when in the space on Lee street between the main and south side-track, look to the eastward to see whether or not a train was approaching from that direction? Answer. No."

"While attempting to pass over said tracks, just before the accident, was the deceased continuously looking to the west or northwest in the direction of the engine and cars attached thereto, and standing west of Lee street on the track first north of the main track? Answer. No, he was looking north and northwest."

"Did the decedent, on the occasion of the accident, and before driving upon the main track, listen for the noise

which ordinarily accompanies a train in operation? Answer. No evidence."

"On the occasion of the accident, how far could a person of ordinary hearing, listening at Lee street crossing, have heard the noise of train number five approaching from the east? Give distance in rods. Answer. Ten or fifteen rods."

"If said Platt had looked eastward, from the point indicated in the last question (being the first question set out in this opinion), could he have seen a train approaching from the east at the rate of thirty to forty miles per hour far enough so that he might have driven across the main track before it reached the crossing? Answer. Yes."

"Was there a point at that time on Lee street in the space between the main and south tracks where Platt could, by looking eastward, have seen a train approaching the crossing and traveling at the rate of thirty to forty miles per hour, in time to have avoided the accident, either by remaining in said space, retreating from it, or hastening over it? Answer. Yes."

"Could one, with ordinary visual organs, at the time of the accident, from a point in the center of the space between the main and side-track in Lee street, have seen a train approaching from the east at a distance of 350 feet? Answer. Yes."

It is evident from the answers to the interrogatories that the place where the decedent attempted to cross the railroad track was one of extraordinary peril, requiring the exercise on the part of the traveler of extraordinary care. The number of tracks, the obstructions which prevented approaching trains from being seen, the temporary increase of the danger by the presence of the freight train which had been cut in two on one of the tracks, the state of the weather, and the lateness of the hour admonished the decedent that only by the exercise of unusual vigilance could his safety in crossing be secured. It appears from the answers to the interrogatories that he exercised no caution whatever. If

there had been but a single main track, his conduct in crossing it would have bordered upon recklessness. His seat was low, the vehicle upon which he rode of a somewhat unwieldly character, and his horses were a considerable distance in advance of the place where he sat. At such a place, and under such circumstances of evident danger, it would seem that the decedent should have gone in advance of his team and made careful observation of his surroundings before he placed himself in a situation of danger from which he could neither safely advance nor retreat. As the noise made by the locomotive of the freight train prevented him from hearing the noise of the approaching train, the necessity for looking up and down the track from some position which enabled him to see an approaching train in time to avoid it, became all the greater. It was incumbent on the appellee to show that his decedent was free from contributory fault, and that the accident resulted exclusively from the negligence of the appellant. The answers to the interrogatories unmistakably proved that the injury to the decedent was the result of his own want of care. The fact that the persons in charge of the locomotive failed to sound the whistle, and ring the bell, as required by the statute, did not excuse the decedent from the exercise of the caution and vigilance demanded by the known perils of the crossing. *Korrady, Adm., v. Lake Shore, etc., R. Co.,* 131 Ind. 261.

Our conclusion is that the court erred in overruling the motion of the appellant for judgment upon the answers to the interrogatories, notwithstanding the general verdict, and for that error the judgment is reversed, with instructions to the Huntington Circuit Court to vacate the judgment and grant a new trial, and for further proceedings not inconsistent with this opinion. This course, we think, will more fully subserve the ends of justice than a direction to the trial court to render judgment against the appellee upon the answers to the interrogatories.

Hadley, J., dissents.

Chicago, etc., R. Co, v. Thomas, Adm.

## DISSENTING OPINION.

HADLEY, J.—I cannot agree with the majority in the result reached in the decision of this case. I am unable to believe that this court is warranted in ruling upon the answers to interrogatories, that, as a matter of law, appellee's intestate was guilty of contributory negligence.

The interrogatories were all propounded by the defendant. We must approach the question under the guidance of the well established rule, that all reasonable presumptions must be indulged against the special answers and in support of the general verdict, and if the general verdict, thus aided, is not in irreconcilable conflict with the answers, it must stand. *Louisville, etc., Co.* v. *Schmidt,* 134 Ind. 16; *Consolidated Stone Co.* v. *Summit,* 152 Ind. 297.

The rule is a most reasonable one. The jury is required to pronounce upon all the issuable facts proved in the case. The court in testing the force of isolated facts disclosed by answers to interrogatories does not know, and can not know, what other facts touching the same matters were rightfully before the jury to justify their verdict. Therefore in conceding to the jury the presumption of right judgment, to overthrow its general verdict the special facts returned should be of such a nature as to exclude the possible existence of other controlling, consistent facts provable under the issues, relating to the same subject.

In this case the jury has said by its general verdict that under all the facts proved the deceased was free from contributory fault, and a few segregated facts, selected by the defendant from the mass of established facts, should not be permitted to prevail over the verdict without reasonable certainty that the jury acted solely upon, or in disregard of the facts returned.

This action having been commenced prior to the act of 1899 (Acts 1899, Ch. 41) it was incumbent upon appellee to show affirmatively that his decedent was in the exer-

cise of due care. The exercise of due care at a railroad crossing, requires the traveler to look and listen before going upon the track. This is undoubtedly the general rule. There are exceptions. The law requires no foolish thing. That which will be ineffectual is excused. Therefore, if Platt by looking could not have seen, or by listening he could not have heard the approaching train in time to have avoided the accident, neither was required. He was only called upon to employ such agencies of information as the perils of the place fairly demanded, and as were calculated to disclose such danger as might be reasonably apprehended from the situation as it then and there appeared. *Pittsburgh, etc., R. Co.* v. *Burton,* 139 Ind. 357.

As set forth in the main opinion the answers to interrogatories show that Platt from the point where he sat on his sled in conversation with another south of the south sidetrack, could not have seen a train approaching from the east until it reached the crossing. This on account of obstructions consisting of Fee's sawmill, 100 feet long north and south, the dock forty feet long, with two or three car loads of lumber thereon, the freight car, and piles of lumber between the main and south side-track. It is also found (number forty-eight) that if Platt had looked eastward from a point in the center of the space between the main and south side-track, he could not have seen a train approaching from the east far enough to have avoided the accident by remaining where he was until it had passed. And by number fifty-one, that from a point in the center of the space between the main and south side-track, one with ordinary visual organs could have seen a train approaching from the east a distance of 350 feet. And by number forty-nine, that if Platt had looked eastward from said center point he could have seen *a train* (not the train) approaching from the east at a rate of thirty to forty miles per hour, far enough so that he might have driven across the main track before it reached the crossing. This means that when

Platt reached this first point of possible observation, and when he, seated on the front bench of his sled would have been within twelve feet of the main track, and his horses actually entering upon it, if the approaching train had been at the remotest point of view, to wit, 350 feet, he could have escaped by driving over the track. He could not have remained where he was and escaped. Having reached this first point whence he could have seen up the track so far as 350 feet his only safety was in going forward. And this is precisely what he was trying to do. To have stopped his team at this point to look and listen with his horses on the track, would have been positive negligence. Having entered within the line of danger due care required him to pass speedily out of it. It is suggested that he should have left his team and gone forward to the main track and made careful investigation before attempting the crossing. How would that have aided him? If he had left his team south of the south siding and gone to the main track, and no train appearing within the limit of his view, or being within 1,000 feet for that matter, which latter distance would have been covered by a train running forty miles per hour, in about seventeen seconds, and 350 feet in less than six seconds, could he have returned to his team, gotten upon his sled, started his horses and driven over the main track before the train had reached the crossing?

And his ability to hear the noise of the approaching train seems quite as impossible. Let us see. Fee's milling house two stories high, the lumber on the dock, Wilkinson's sawmill, the freight car on the south siding, the piles of lumber between the main and south side-track, constituted an unbroken, intervening obstruction to sound. Fee's sawmill was running, it was snowing, the wind blowing from the west, a locomotive standing on the first siding north of the main track was blowing off steam and on the locomotive drawing the approaching train neither the bell was being rung, nor the whistle sounded, and from these conditions

the jury answered (number ninety-three) that a person of ordinary hearing, listening at Lee street crossing (that is from the center of the main track) could have heard the noise of the approaching train ten or fifteen rods (160 or 247 feet). What use then of listening south of the south siding or at any other place while behind Fee's mill or the other obstructions extending south from the main track 165 feet? Under the special facts disclosed, so far as serving him in learning the real danger was concerned, Platt might as well have been without eyes or ears until he reached such relation to the main track that his only possible safety was to hasten over it.

The failure to look and listen before entering upon a railroad crossing, when the eye and ear may clearly be useful in discovering the approach of trains in time to avoid injury, is negligence *per se* and belongs exclusively to the court to characterize, but when extraordinary conditions exist to make the question of effective seeing and hearing doubtful; and when unusual and unexpected appearances suddenly arise at a crossing either of safety or peril, which are naturally inclined to control differently the conduct of equally prudent persons in like place, so that ordinary conduct in such situation may be subject to more than one inference and to an honest difference of opinion among men of equal intelligence and prudence, then in such cases the question of negligence or due care is not one of law but one of fact for the jury. *Baltimore, etc., R. Co.* v. *Walborn,* 127 Ind. 142, and cases cited; *Cleveland, etc., R. Co.* v. *Harrington,* 131 Ind. 426; *Cincinnati, etc., R. Co.* v. *Grames,* 136 Ind. 39; *Cleveland, etc., R. Co.* v. *Moneyhun,* 146 Ind. 147, 34 L. R. A. 141; *Grand Rapids, etc., R. Co.* v. *Cox,* 8 Ind. App. 29; *Pittsburgh, etc., R. Co.* v. *Burton,* 139 Ind. 357, 373; *French* v. *Taunton Branch Railroad,* 116 Mass. 537; *Huckshold* v. *St. Louis, etc., R. Co.,* 90 Mo. 548, 2 S. W. 794; *Missouri Pac. R. Co.* v. *Lee,* 70 Tex. 496, 7 S. W. 857; *Teipel* v. *Hilsendegen,* 44 Mich. 461, 7 N. W. 82.

Chicago, etc., R. Co. v. Thomas, Adm.

In the last case cited, Judge Cooley says: "If the circumstances are such that reasonable minds might draw different conclusions respecting the plaintiff's fault, he is entitled to go to the jury upon the facts."

In the Harrington case, 131 Ind. 426, the plaintiff was forty years old, well acquainted with the crossing, and of good sight and hearing. There were four tracks at the crossing over one of which, as she approached on foot, a freight train was passing north. When at a distance of thirty-seven feet from the track, she could see north up the track, upon which she was injured, 400 feet. At this point she looked, and, seeing no train, continued her course over the tracks looking in a southwest direction and was caught and injured by a train from the north. The train was running at a greater rate of speed than was allowed by city ordinance and no bell was being rung. With respect to these facts, the court says: "In our opinion the decided weight of authority is that under the facts and circumstances in this case, the question of contributory negligence was a question for the jury under proper instructions from the court."

The situation at the crossing at the time of the accident was extraordinary, and abounded in conditions unusual, unexpected and deceptive. It was in the dusk of the evening, and snowing and wind blowing from the west; there was the noise of Fee's mill, of the steaming locomotive, the obstructions to sight and sound, the total absence of the usual signals of an approaching train—a warning required by law, and which the decedent had the right to believe would be given,—coupled with the reasonable right to believe that the sounding whistle and ringing bell could be heard above the din existing at the crossing, and for the want of it, the right to believe that no train was near. Thus confronted he was called upon to act, or abandon the use of the highway. He was entitled to its use. His right to use it was equal to the right of appellant and it seems to me a harsh rule that will require of him the absurd, or the impossible—made so

largely by the appellant itself—as a condition of exoneration from fault. Such a rule is a practical denial of the right to use a crossing at all in cases of this sort.

It seems to me most probable that all men of equal prudence and intelligence, in like place, would not act in the same way, and, therefore, under the weight of authority, the conduct of the decedent with respect to negligence, or due care, under the circumstances surrounding him, was properly submitted to the jury.