# PITTSBURGH, CINCINNATI, CHICAGO & ST. LOUIS RAILROAD COMPANY *v.* FERRELL, BY NEXT FRIEND.

[No. 5,553. Filed October 26, 1906. Rehearing denied February 26, 1907.]

PLEADING. — *Complaint.—Wilful Injuries.—Railroads.—Highway Crossings.—Manslaughter.*—A complaint alleging that defendant railroad company "wilfully, purposely and recklessly * * * ran its locomotive and train of cars" against the plaintiff, who was crossing such company's track on the public highway, does not state a cause of action. Wiley, J., concurs in separate opinion. Robinson, C. J., dissents. Roby, J., dissents in two opinions in which authorities on wilfulness and manslaughter are collected.

From Johnson Circuit Court; *W. J. Buckingham,* Judge.

Action by John C. Ferrell, by his next friend, against the Pittsburgh, Cincinnati, Chicago & St. Louis Railway Company. From a judgment on a verdict for plaintiff for $900, defendant appeals. *Reversed.*

*M. Z. Stannard* and *Branigan & Williams,* for appellant.

*J. B. Huntington, Douglas Dobbins* and *Miller & Barnett,* for appellee.

COMSTOCK, J.—Action brought to recover damages for personal injuries sustained by the appellee, caused by coming in collision with appellant's train. The complaint was in two paragraphs. Appellant's demurrer to the first was sustained and to the second overruled. Appellant answered the second paragraph by general denial, and the issue was tried on the second paragraph and the general denial thereto. Cause was submitted to a jury and a general verdict returned in appellee's favor for $900, for which amount judgment was rendered.

The appellant relies for a reversal of the judgment upon the action of the court in overruling its demurrer to the

second paragraph of complaint and in overruling its motion for a new trial. Said paragraph was held to be sufficient by the trial court, as charging wilful injury. Instructions to the jury were given and refused, and the cause was tried upon the theory that said paragraph charged a wilful injury. To quote from appellee's brief: "There was not the slightest suggestion in the lower court that there was any element of negligence in this case. It was a wilful injury case, pure and simple." If not good upon this theory, the court erred in overruling appellant's demurrer.

Omitting the formal parts of said second paragraph of complaint, it is alleged that the defendant ran a locomotive and a train of cars over, along and upon its said railroad, situated in the town of Whiteland, Johnson county, Indiana, the same being an incorporated town of said State; that at the time said defendant so ran said locomotive and said cars, plaintiff was driving a team of horses, hitched to a wagon, along and upon a street of said town, "the same being a public thoroughfare in said town frequently traveled by large numbers of vehicles and foot passengers, and being situated in a populous part of said county and town; that at the time plaintiff attempted to drive across defendant's said railroad, where said public thoroughfare crosses the same, and while attempting to cross, as he lawfully might at said point, the same being a public crossing as aforesaid, defendant was wilfully and recklessly running said locomotive with said cars attached over and along said railroad through said town of Whiteland at an excessive, unusual and highly dangerous rate of speed, to wit, a speed of sixty miles per hour; that, when defendant approached said highway crossing and was attempting to pass over the same as aforesaid, defendant, well knowing the dangerous location of the same, and well knowing that the same was situated in a populous section of said county and town, and well knowing that said crossing was frequented by large numbers of teams and foot

passengers, who must needs cross said defendant's railroad at said crossing, wilfully, purposely and recklessly, without regard to life or limb of the people who were crossing at that crossing, and without regard to the welfare of this plaintiff, ran its locomotive and train of cars over and against the team that plaintiff was driving, and against this plaintiff, with great force and violence, and by reason thereof said wagon was torn in fragments, said horses were instantly killed, and plaintiff was thrown a great distance with immense force, so that he was severely hurt and injured thereby, internally and externally, being bruised," etc.

Wilfulness implies design. It involves conduct which is *quasi*-criminal. *Walker* v. *Wehking* (1902), 29 Ind. App. 62; *Union Traction Co.* v. *Lowe* (1903), 31 Ind. App. 336; *Brooks* v. *Pittsburgh, etc., R. Co.* (1902), 158 Ind. 62; *Dull* v. *Cleveland, etc., R. Co.* (1899), 21 Ind. App. 571. It is said in *Kalen* v. *Terre Haute, etc., R. Co.* (1897), 18 Ind. App. 202, 63 Am. St. 343, that "to be good as a complaint for wilful injury, it should show by some consistent form of averment that the injurious act was purposely done with the intent on the part of the doer to inflict wilfully and purposely the particular injury of which complaint is made." Wilfulness is a desire or intention to produce a certain result. In *Union Traction Co.* v. *Lowe, supra,* the court said: "This paragraph of complaint is clearly insufficient. It falls far short, under the law as announced in the decided cases in this State, of stating a cause of action for a wilful injury. It seems to be a settled law of this State that a complaint which seeks redress for a wilful injury, involving, as it does, conduct which is *quasi*-criminal, must aver that the injurious act was purposely and intentionally committed with the intent wilfully and purposely to inflict the injury complained of." Wilfulness and negligence are held inconsistent. Purpose or design is foreign to negligence. *Parker* v. *Pennsylvania Co.* (1893), 134

Ind. 673, 23 L. R. A. 552. Wilfulness cannot be inferred from mere knowledge on the part of the operatives of the appellant of the presence of the injured party. Before wilfulness will be inferred such operatives must have knowledge also of the inability of the injured party to avoid the injury. *Parker* v. *Pennsylvania Co., supra; Brooks* v. *Pittsburgh, etc., R. Co.* (1902), 158 Ind. 62; *Cleveland, etc., R. Co.* v. *Miller* (1898), 149 Ind. 490. Where the doer was without knowledge of the presence and situation and peril of the injured party, the act done cannot be said to have been wilfully inflicted. *Brooks* v. *Pittsburgh, etc., R. Co., supra; Parker* v. *Pennsylvania Co., supra.*

A complaint charging wilful injury must be strictly construed. *Union Traction Co.* v. *Lowe, supra.* So that the paragraph of complaint before us, to be sufficient, should allege that the injurious act was purposely done with the intent on the part of the doer to inflict the injury of which complaint is made. Said paragraph does not allege that those operating the train knew of appellee's presence on and near the crossing. It is not averred that the injurious act was purposely done with the intent on the part of the doer, wilfully to inflict the injury of which complaint is made. In *Conner* v. *Citizens St. R. Co.* (1896), 146 Ind. 430, 435, the court says: "The substance of the rule as established by the cases to which we have referred is, that to entitle one to recover for an injury, without showing his own freedom from contributory fault, the injurious act or omission must have been purposely and intentionally committed, with a design to produce injury, or it must have been committed under such circumstances as that its natural and reasonable consequence would be to produce injury to others, the actor having knowledge of the situation of those others." The only averment of wilfulness exists in the charge of the running of the train at a high rate of speed over a public crossing in a populous section of the town, knowing that said section was populated by large

numbers of teams and foot passengers who must cross said defendant's road at said crossing. There is no averment that statutory signals were not given, not that any ordinance of the town was violated, nor that appellant knew that appellee was on or near the crossing. As against the pleader, in ruling upon the demurrer, we must presume that the railroad at the crossing in question, in both directions, was straight and open, and free from obstructions of any kind for a distance of eighty rods, and that the whistle was sounded and the bell rung as required by the statute. These conditions are inconsistent with a wilful intent. Such acts are not even negligence *per se* at an ordinary country crossing. *Lake Shore, etc., R. Co.* v. *Barnes* (1906), 166 Ind. 7.

Counsel for appellee contend that there are two classes of wilful injury cases: (1) Those in which the act that produced the injury was intentional; (2) those in which the act that produced the injury was done under circumstances such as evinced a reckless disregard of inflicting the injury complained of; that the case at bar belongs to the second class. The following cases are cited: *Louisville, etc., R. Co.* v. *Bryan* (1886), 107 Ind. 51, 53; *Belt R., etc., Co.* v. *Mann* (1886), 107 Ind. 89, 92; *Louisville, etc., R. Co.* v. *Ader* (1887), 110 Ind. 376, 380; *Gregory* v. *Cleveland, etc., R. Co.* (1887), 112 Ind. 385, 387; *Brannen* v. *Kokomo, etc., Gravel Road Co.* (1888), 115 Ind. 115, 7 Am. St. 411; *Citizens St. R. Co.* v. *Willoeby* (1893), 134 Ind. 563; *Chicago, etc., R. Co.* v. *Spilker* (1893), 134 Ind. 380; *Korrady* v. *Lake Shore, etc., R. Co.* (1892), 131 Ind. 261; *Cleveland, etc., R. Co.* v. *Miller* (1898), 149 Ind. 490, 499; *Pittsburgh, etc., R. Co.* v. *Judd* (1894), 10 Ind. App. 213; *Louisville, etc., R. Co.* v. *Cronbach* (1895), 12 Ind. App. 666; *Lake Erie, etc., R. Co.* v. *Brafford* (1896), 15 Ind. App. 655, 661; *Miller* v. *Miller* (1897), 17 Ind. App. 605; *Hancock* v. *Lake Erie, etc., R. Co.* (1898), 21 Ind. App. 10, 19; *Brooks* v. *Pitts-*

*burgh, etc., R. Co.* (1902), 158 Ind. 62. Counsel for appellee call special attention to *Belt R., etc., Co.* v. *Mann, supra; Chicago, etc., R. Co.* v. *Spilker, supra; Cleveland, etc., R. Co.* v. *Miller, supra; Brooks* v. *Pittsburgh, etc., R. Co., supra.* In *Belt R., etc., Co.* v. *Mann, supra,* Mitchell, J., speaking for the court, says: "The use of the phrase 'wilful negligence,' in the connection in which it is frequently employed, is, to say the least, inapt. Whatever idea the word 'wilful' may express when so used, it is beyond question that to entitle one to recover for an injury to which his own negligence may have contributed, the injurious act or omission must have been purposely and intentionally committed, with a design to produce injury, or it must have been so committed under such circumstances as that its natural and probable consequence would be to produce injury to others. There must have been either an actual or constructive intent to commit the injury. The act must have involved conduct, *quasi*-criminal in character. * * * To constitute a wilful injury the act or omission which produced it must have been purposed and intentional, or must have been committed under such circumstances as evinced a reckless disregard for the safety of others." In substance, the language above set out has been followed in every opinion involving the question before us since delivered in this State, and in some of them the exact language has been used. The following expression also occurs in the opinion: "There is no language in the paragraph under consideration which can be said to charge that the appellant's employes had an intent, either actual or constructive, to commit the injuries complained of. It does not appear that they had knowledge of the plaintiff's presence in time to avoid the collision, or that the crossing was of such a character as that the natural and probable consequence of running an engine, in the manner described, would be to produce an injury such as that suffered by the plaintiff."

Pittsburgh, etc., R. Co. *v.* Ferrell—39 Ind. App. 515.

The question before us is one of pleading, not of evidence. If, upon a sufficient complaint, we were discussing the sufficiency of the evidence, the doctrine of implied intent would be properly considered. The rule requires that facts must be averred and proved in the case. It is averred only by recital that people were crossing at said crossing. The paragraph in question is defective in failing to aver that the servants of the appellant operating the train knew of appellee's presence on or near the crossing, and that the injurious act was prompted with the intent upon the part of the doer wilfully to inflict the injury of which complaint is made. In wilful injuries the intention with which the act is done constitutes the wrong, and is the gist of the charge. In pleading, that intent will not be inferred. An intent to commit a wilful injury may be inferred from facts proved, because intent may be established by positive or circumstantial evidence. An intent to kill, as has often been said, may be inferred from the discharge of a loaded gun upon the public street or into a crowd, but it would be necessary, in an indictment for homicide, under such a state of facts, to charge that the act was done with intent to kill. A *quasi*-criminal act consists of an act and intent. The union of the two is necessary—both must be charged. "In pleading, facts must be directly and positively alleged, while in regard to evidence conclusions may be inferred from facts and circumstances without positive statements." *Laporte Carriage Co.* v. *Sullender* (1905), 165 Ind. 290, and cases cited. The only averment which can be claimed to show intent is that appellant purposely ran its locomotive against appellee. The pleader evidently relied upon the facts averred to raise the presumption of criminal intent. Under the decisions of this State the averment is not sufficient.

An examination of the evidence shows that the charge of wilfulness, if properly made, is not sustained. The following is a condensed recital of the evidence: Appellant's

track through Whiteland ran north and south. The station building was north of the highway and east of the railroad track. East of the station was a closet and coal shed. East of these was the blacksmith shop. East of the blacksmith shop was Dr. Phipps's premises, on which were an orchard, dwelling-house and outbuildings. North of Dr. Phipps's premises was the canning factory. The station building was forty feet long and sixteen feet wide, and it was twenty feet east of the center of the railroad track. The open space between the closet and the blacksmith shop was twenty feet. These improvements were all upon the land lying between the highway and railroad track, the canning factory being about one-quarter of a mile north of the crossing. These improvements created a partial obstruction to the view of the track to one driving from the canning factory to the crossing. Just south of the crossing was an elevator. When the elevator and canning factory were in operation, as they were on the date of the accident, both made rumbling noises that could be heard a distance of from one-quarter to one-half mile away. Appellant's train, a regular passenger train, approached and passed over the crossing at a speed of from fifty to sixty miles per hour. The highway was used by the public, and from one hundred to one hundred twenty-five teams passed over the crossing daily during the summer season, when the canning factory was in operation. When the train was one-quarter of a mile north of the crossing the whistle signal was sounded and the bell was rung continuously until the train passed over the crossing. Appellee was familiar with the crossing · and with the fact that fast trains made use of the track and crossing. Appellee had taken a load of peas to the canning factory, and in doing so had passed over the crossing. After unloading the peas, appellee drove the team from the canning factory southwestwardly to the crossing. Bert Voris was riding on the wagon with him. Appellee drove at a brisk trot from the

canning factory to within five or eight feet of the crossing. When the heads of the horses came within from five to eight feet of the railroad track, the horses, of their own volition, slowed down to a walk, and proceeded onto the crossing, where the collision occurred. Appellee did not, nor did the team, stop at any point between the canning factory and the crossing. On the way from the canning factory to the crossing Bert Voris called appellee's attention to the fact that it was about train time, and appellee stepped to the forward part of the wagon and looked for the train, tightening the lines in his hands as he did so. As appellee and Voris approached the crossing between the blacksmith shop and station building, Melton Hughes, after hearing the train signal, attempted to signal them by waving his hand and hallooing, "Hello, boys, yonder is the train!" At this time the team was going in a trot, and appellee and Voris were engaged in conversation. They continued to converse in this way until the horses' heads were almost to the railroad track. When the team went upon the crossing it was struck by the train, killing both horses, breaking the wagon and harness, throwing appellee some distance from the wagon and inflicting upon him the injuries complained of. By stopping north of the blacksmith shop, or between the blacksmith shop and the station, appellee could have seen part of the track north of the station. The engineer in charge of the locomotive did not see appellee or know of his presence in the vicinity of the crossing at any time before the collision occurred. The fireman, who was in the cab with the engineer, discovered appellee just as he was about to enter on the railroad track, but too late to take steps to stop the engine and avert the accident. Before this the fireman had not seen the appellee and had no knowledge of his presence in the vicinity of the crossing.

To refer more particularly to the testimony of the engineer, he testified that he was in his proper place, on the

right side (west side) of the engine; that the crossing was free and clear of obstructions, as far as he could see; that he was running the train on schedule time, at forty miles an hour; that the crossing appeared to be clear, and he believed it to be clear, and that he had no intention of injuring the plaintiff or any one. The testimony of these witnesses furnishes no evidence to sustain the charge of wilful injury. If there is any evidence tending to support its charge, it must be in the fact that the train ran at the high rate of from fifty to sixty miles an hour over the crossing over which from one hundred to one hundred twenty-five teams passed daily during the summer season when the canning factory was in operation. This high rate of speed might show heedlessness, but not wilfulness. In *Brooks* v. *Pittsburgh, etc., R. Co.* (1902), 158 Ind. 62, 70, the court say: "It must be borne in mind that while the evidence tends to prove that the appellee's servants were heedless of the rights of persons who might be upon the crossing, yet that there is no evidence that such servants had knowledge that any person was upon or near the crossing." The evidence in fact shows that after the plaintiff's first danger was seen by the fireman, there was no opportunity or time to avoid the accident.

In the case of *Lake Shore, etc., R. Co.* v. *Barnes* (1906), 166 Ind. 7, it is said not to be negligence for railroad companies to run their trains over ordinary public crossings, in the absence of a speed ordinance, at any speed they choose, not inconsistent with the safety of the persons and things in their charge. In this case the evidence shows that the train was run in the usual manner, in the usual way and on schedule time. Presumptions may arise from circumstances, but they are not conclusive as against positive evidence. No presumption of the wrongful purpose can arise from the fact that lawful signals were given of appellant's approaching train; nor can such presumption arise from the running of the train in a lawful manner,

without knowledge of the presence of any one near the track, because knowledge is essential to purpose.

We have considered only the question of wilfulness, and, if we concede that the complaint is sufficient upon that theory, the charge is without support in the evidence.

Judgment reversed, with instructions to sustain the demurrer to the complaint.

Black and Myers, JJ., concur in the result. Concurring opinion by Wiley, J. Robinson, C. J., dissents. Dissenting opinion by Roby, J.

## CONCURRING OPINION.

WILEY, J.—The facts pleaded and those disclosed by the evidence are so fully and fairly stated in the prevailing opinion that it is unnecessary to restate them here as a basis for the expression of the individual views which I entertain upon the vital questions involved in this appeal.

The appellee bases his right to recover upon the acts of appellant, as stated in the complaint, which acts are characterized as wilful. In other words, the appellee charged in his complaint that appellant "wilfully, purposely, and recklessly" inflicted injury upon him, and hence the judgment in his favor rests upon a wilful act of appellant, resulting in injury. It is important to understand what is meant in the use of the word "wilful," or wilfully, as used in the complaint. It is " 'the quality of being wilful; obstinacy; stubborness; perverseness; voluntariness.' " *Dull v. Cleveland, etc., R. Co.* (1899), 21 Ind. App. 571. It was said in *In re Young & Harston's Contract* (1885), 31 Ch. D. 168, that wilful "is a word of familiar use in every branch of law, and although in some branches of the law it may have a special meaning, it generally, as used in courts of law, implies nothing blamable, but merely that the person of whose action or default the expression is used, is a free agent, and that what has been done arises from the spontaneous action of his will. It amounts to

nothing more than this, that he knows what he is doing, and intends to do what he is doing, and is a free agent." We quote the following from *Fuller* v. *Chicago, etc., R. Co.* (1871), 31 Iowa 187: "It is said by defendant's counsel that the word 'wilfully' implies the idea of malice of a mild kind, an evil intent without excuse. Such may be its meaning in indictments and criminal statutes. But it is not to be so understood here. The word means, 'obstinately, stubbornly; with design; with a set purpose,' and this definition must be applied to it where it occurs in the statute under consideration." In *Louisville, etc., R. Co.* v. *Bryan* (1886), 107 Ind. 51, appellee sued to recover damages for a team of horses killed. One paragraph of his complaint was based upon wilfulness, and the charging part of that paragraph was as follows: "And that said collision was caused by the reckless, negligent, and wilful conduct of said employes and servants of said defendant in the management of said locomotive, in this, to wit: That said locomotive was being propelled at an exceedingly high and dangerous rate of speed, and was being propelled backwards, and that the whistle on said locomotive was not sounded, and the bell was not rung, to give warning of the approach of said locomotive; * * * that said crossing was made extra dangerous by the track's being hidden from view for some distance by intervening buildings, all of which was well known to said defendant, and its servants." It was held that the complaint did not charge wilful injury, and in deciding the question Mitchell, J., said: "To constitute a wilful injury, the act which produced it must have been intentional, or must have been done under such circumstances as evinced a reckless disregard for the safety of others, and a willingness to inflict the injury complained of."

In the case from which I have just quoted it was held that the facts charged failed to bring the case within either of the conditions expressed, or to indicate an actual or con-

structive intent on the part of appellant; that is, the language used in the complaint did not show that the act complained of was intentional, or, under the circumstances detailed, evinced a reckless disregard for the safety of others, and a willingness to inflict the injury. "Wilfulness," as used in the complaint, cannot exist without purpose or design. *Parker* v. *Pennsylvania Co.* (1893), 134 Ind. 673, 23 L. R. A. 552; *Belt R., etc., Co.* v. *Mann* (1886), 107 Ind. 89. A person may be held liable for the consequences of a wilful act without actual knowledge of the presence of the object acted upon, but his liability never exists where the act or omission is one from which the injury could not reasonably have been anticipated as the natural and probable consequence of such act or omission. *Parker* v. *Pennsylvania Co., supra.* This statement of the law is the key to the solution of the question of wilfulness as presented by the complaint.

The case I am considering presents no stronger case of wilfulness than the cases of *Louisville, etc., R. Co.* v. *Bryan, supra,* and *Belt R., etc., Co.* v. *Mann, supra.* Here appellee states three facts which he insists constitute wilfulness: (1) High and excessive rate of speed; (2) a public highway, crossing appellant's track, which was frequently used by the public; (3) appellant knew that it was so used. It may be observed that it is charged that Whiteland, through which appellant's train was being run, was an incorporated town, yet it is not charged that said train was run in violation of any ordinance limiting the speed of trains within the corporate limits of said town. This being true, appellant had the right to run its train over the crossing at any rate of speed it chose that was not inconsistent with the safety of the "persons or things" in its charge. *Lake Shore, etc., R. Co.* v. *Barnes* (1906), 166 Ind. 7, and authorities cited. In the case last cited the action was based upon negligence, and the negligence charged was in running a train of cars at a high and dangerous rate of speed

over a crossing of the "Michigan road, and that said Michigan road was at the time the main highway between the city of South Bend and the town of New Carlisle, and a great many persons were constantly traveling said highway and crossing said tracks," etc.   The court in that case said: "But no attempt is made to set up in the paragraph under consideration an exceptional crossing, except as to the number of persons using it.   *   *   *   The number of persons daily passing or repassing over the crossing   *   *   * cannot affect the rights and duties of appellant at the crossing, in the absence of any showing that the number was known to be so great as to impede progress, or in some other way make the crossing more difficult and dangerous to travelers.   Persons having eyes and ears must use them at grade crossings, each for himself, whether alone or in a great company, and, when by the exercise of due care each may escape injury, it makes no difference in the company's right to speed its train over a crossing whether there is one or many in the act of passing over the same."   I recognize the fact that in that case the court was dealing with a question of negligence and not a question of wilfulness.   I also recognize that, in an action to recover damages resulting from a wilful act, the question of negligence on the part of the defendant and contributing negligence on the part of the plaintiff are eliminated.   The fact that "large numbers of vehicles and foot passengers" passed over the crossing, and the fact that, with a knowledge of that fact, appellant ran its train at a speed of sixty miles an hour, do not, in my judgment, constitute wilfulness, within the meaning of that term.   The expression "large numbers of vehicles and foot passengers" is but a relative term.   It is too indefinite to have any fixed meaning in a pleading.   *Lake Shore, etc., R. Co.* v. *Barnes, supra.*   The language used in this complaint descriptive of the surroundings and conditions and the acts of the appellant is so similar to that used in the case last cited that there is no distinction to be

drawn, except here the language used and facts stated are made the basis of a wilful act, while in that case they are made the basis of a negligent act. The employes in charge of appellant's train had a right to presume that a traveler on the public highway approaching and intending to cross its track would both look and listen for an approaching train. There is no charge in the complaint that the train was late, or running out of its schedule time, or at a greater rate of speed than that at which it was scheduled to run. There is a line of cases holding that in a complaint which seeks redress for a wilful injury involving, as it does, conduct which is *quasi*-criminal, it must be averred that the injurious act was purposely and intentionally committed, with the intent wilfully and purposely to inflict the injury complained of. *Union Traction Co.* v. *Lowe* (1903), 31 Ind. App. 336; *Gregory* v. *Cleveland, etc., R. Co.* (1887), 112 Ind. 385; *Kalen* v. *Terre Haute, etc., R. Co.* (1897), 18 Ind. App. 202, 63 Am. St. 343; *Walker* v. *Wehking* (1902), 29 Ind. App. 62; *Indianapolis St. R. Co.* v. *Taylor* (1902), 158 Ind. 274. In my judgment, the facts pleaded bring the case at bar within this rule.

In many respects we are living in an exceptional age, and it may be truthfully said that we are living in an age of rapid transit. It is a fact gleaned from the current events of the day that railway companies are continually increasing the speed of their trains to meet the demands of their patrons and the rapid growth of business. We also know, as a matter of common knowledge, that railways, traversing the country, cross highways in frequent use by persons traveling upon them. If it can be said as a matter of law (and it is a question of law arising upon the demurrer to the complaint) that the facts pleaded here constitute wilfulness, for which appellant is answerable in damages, then railroad companies will be greatly restricted in the operation of their trains, the rights of the traveling public will be infringed, and rapid transit retarded. Not

only that, but such a rule carried to its logical conclusion would render the servants and employes of trains, under such conditions, amenable to the criminal law. Again, if such a rule is declared by the courts, it will practically eliminate from the law the doctrine of contributory negligence, which is as old as the common law itself. In such case all that would be necessary in actions of this character would be to allege facts substantially like those here, prove that the railroad crossed a public highway that was used by a large number of persons, that the train was being run at a high rate of speed, and that injury resulted. I am not prepared to give my approval to such a rule, which must be affirmed to support the judgment in this case. As, in my judgment, the complaint does not state facts sufficient to constitute a cause of action upon the theory of wilfulness, the demurrer to it should have been sustained. The facts, also, which are fully stated in the prevailing opinion, do not support the judgment.

## Dissenting Opinion.

Roby, J.—This is an action for damages on account of personal injuries averred to have been wilfully inflicted upon appellee by the appellant. The cause was tried upon the second paragraph of complaint, a demurrer to the first paragraph having been sustained. The issue was formed by a general denial. Trial by jury, verdict for $900, motion for new trial overruled, and judgment on verdict from which this appeal is taken.

The action of the court in overruling a demurrer, for want of facts, to the second paragraph of complaint, is assigned as error. The pleading is unnecessarily prolix, but it is therein directly averred that the appellant "wilfully, purposely and recklessly" inflicted the injuries complained of. This allegation is essential to a complaint counting upon wilfulness, and tenders the issue. The complaint was sufficient and the demurrer was correctly overruled. *Gregory* v. *Cleveland, etc., R. Co.* (1887), 112 Ind. 385, 387;

*Union Traction Co.* v. *Lowe* (1903), 31 Ind. App. 336; *Brooks* v. *Pittsburgh, etc., R. Co.* (1902), 158 Ind. 62.

Whiteland is an incorporated town and a station on the defendant's railroad. The train by which appellee was struck was not scheduled to stop at Whiteland, and the same speed was maintained through the town as through the country. The rate at which this particular train was running was a little faster than usual, estimated at sixty miles an hour. The town is divided by the railroad track, being partly on the east and partly on the west side thereof. There were two streets crossing the track in said town, one the main street and one north at the depot. Plaintiff was injured at the depot crossing. There was a canning factory one-fourth of a mile north of the depot. The wagon road crossed the railroad at about right angles, after which it described a curve and ran due north past the canning factory, diverging from the railroad, the direction of which was northwest and southeast. The defendant's station, sixteen by forty feet in size, was north of the highway and twenty feet east of the center of the railroad track. A water-closet and coal shed stood at its northeast corner. Twenty feet further northeast, along said wagon road, was a blacksmith shop. There was an orchard between the highway and railroad north of the depot, and there were shade trees at various points along the highway. The foliage upon the trees at the date of the injury complained of (June 10) together with the buildings described, greatly obstructed the view of persons approaching from the east, rendering it difficult for them to see trains coming from the north. That portion of the track north of the canning factory was hidden by the factory buildings. There were points within two hundred feet of the railroad from which a traveler could see such train if the relative positions occupied by the train and traveler at the moment of observation happened to be favorable, and there were many places from which it could not be observed. Appellant's plat shows the situation as follows:

The evidence does not show the population of the town or the number of its business places. It had several stores, a post-office, a school, a blacksmith shop and a considerable number of dwellings. The crossing in question was constantly used by persons traveling along the highway. No very accurate statement of the number of persons so using it is made. The witnesses say that it was used by many people, the employes in the factory, school children and others. One witness estimates the number of teams crossing during a day at from one hundred to one hundred fifty. It is inferable that the defendant ran a number of trains over its track daily, but the number is not shown. No safeguards to prevent collision were provided at the crossing, there was no watchman or gate, and the railroad track was only about two feet higher than the street. The evidence justifies the finding that the engineer who ran the engine, and the defendant, by whom a schedule was made which the engineer was required to maintain, knew the conditions existing at the crossing. The preponderance of the evidence is to the effect that the whistle on the engine drawing said train was sounded near the canning factory, and that the engine bell was ringing as the train passed through the town. No pretense is made that any whistle was sounded except at the place named. Neither the engineer nor fireman actually saw appellee until the collision. There is much evidence as to the conduct of appellee in approaching the track, and under some of the late decisions there might have been ground, in an action for negligence, to submit the question of his contributory negligence to the jury, but such facts and the quality of his conduct are not material here. Contributory negligence is not a defense to an action for wilful injury. *Indianapolis, etc., R. Co.* v. *Petty* (1868), 30 Ind. 261; *Lake Erie, etc., R. Co.* v. *Brafford* (1896), 15 Ind. App. 655, 660; *Brannen* v. *Kokomo, etc., Gravel Road Co.* (1888), 115 Ind. 115, 7 Am. St. 411; *Fisher* v. *Louisville, etc., R. Co.*

(1897), 146 Ind. 558, 562; *Miller* v. *Miller* (1897), 17 Ind. App. 605; *Aiken* v. *Holyoke St. R. Co.* (1903), 184 Mass. 269, 68 N. E. 238; *Louisville, etc., R. Co.* v. *Markee* (1893), 103 Ala. 160, 170, 15 South. 511, 49 Am. St. 21; 1 Thompson, Negligence (2d ed.), §206; Cooley, Torts (2d ed.), *674.

Appellee, standing up in a lumber wagon, driving from the canning factory, entirely oblivious of the defendant's train, drove along the highway and upon the track, at which place his wagon was struck by said train with great force. The general verdict carries with it, under the issues, a finding that the collision with plaintiff's vehicle was wilful. Whether such finding is supported by any evidence is the question upon which the disposition of the appeal depends, and is presented by an assignment that the court erred in overruling the motion for a new trial. A correct answer depends upon a clear understanding of the issue. The common meaning of the word "wilful" is "voluntarily or intentionally." *Chicago, etc., R. Co.* v. *Nash* (1891), 1 Ind. App. 298, 302; *Dull* v. *Cleveland, etc., R. Co.* (1899), 21 Ind. 571; *Miller* v. *Miller* (1897), 17 Ind. App. 605; *City of Indianapolis* v. *Consumers Gas Trust Co.* (1895), 140 Ind. 246, 255; *Illinois Cent. R. Co.* v. *Leiner* (1903), 202 Ill. 624, 631, 67 N. E. 398, 95 Am. St. 266; 2 Bouvier's Law Dict., title, Wilfully; Clark & Marshall, Crimes (2d ed.), §60.

Wilfulness and negligence are incompatible terms. Negligence arises from inattention, thoughtlessness, and heedlessness, while wilfulness cannot exist without purpose or design. *Brooks* v. *Pittsburgh, etc., R. Co., supra; Parker* v. *Pennsylvania Co.* (1893), 134 Ind. 673, 679, 23 L. R. A. 552; *Miller* v. *Miller, supra; Pennsylvania Co.* v. *Meyers* (1894), 136 Ind. 242, 258; *Indiana, etc., Oil Co.* v. *O'Brien* (1903), 160 Ind. 266, 272; *Cleveland, etc., R. Co.* v. *Tartt* (1900), 99 Fed. 369, 39 C. C. A. 568, 49 L. R. A. 98; *Terre Haute, etc., R. Co.* v. *Graham* (1884),

Pittsburgh, etc., R. Co. v. Ferrell—39 Ind. App. 515.

95 Ind. 286, 293, 48 Am. Rep. 719; *McCollum* v. *Cleveland, etc., R. Co.* (1900), 154 Ind. 97, 100.   That wilfulness involves conduct which is *quasi*-criminal, is declared in the following decisions: *Louisville, etc., R. Co.* v. *Bryan* (1886), 107 Ind. 51, 53; *Miller* v. *Miller, supra; Cleveland, etc., R. Co.* v. *Miller* (1898), 149 Ind. 490; *Parker* v. *Pennsylvania Co., supra; Belt R., etc., Co.* v. *Mann* (1886), 107 Ind. 89, 93; *Brooks* v. *Pittsburgh, etc., R. Co., supra; Walker* v. *Wehking* (1902), 29 Ind. App. 62; *Dull* v. *Cleveland, etc., R. Co., supra; Union Traction Co.* v. *Lowe, supra; Indianapolis St. R. Co.* v. *Taylor* (1902), 158 Ind. 274; *Indianapolis St. R. Co.* v. *Darnell* (1904), 32 Ind. App. 687.   A *quasi* crime is an offense not constituting a crime or misdemeanor at law, but which is in the nature of a crime.   "A class of offenses against the public which have not been declared crimes, but wrongs against the general or local public which it is proper should be repressed or punished by forfeitures and penalties."   2 Bouvier's Law Dict., title: *Quasi* Crimes.   A wilful injury being only *quasi*-criminal, it follows that it is not necessary to sustain a charge of wilfulness that the evidence make out a case of first degree murder.   *Chicago, etc., R. Co.* v. *Nash, supra.*   It is not necessary that the defendant, who is averred to have committed wilful injury to another, be proved guilty of second degree murder or manslaughter. Liability is fixed by proof of an act which is a wrong against the general or local public, although not within the terms of any statute, by which damage is caused.   It also follows that, if death is caused under such circumstances as to amount to first or second degree murder or manslaughter, there can never be any doubt of civil liability. The greater includes the less; and this is true also as to the extent of the injury inflicted.   In the case at bar, death did not follow the alleged wilful injury.   Had it done so, and if the appellant would then have been guilty of murder or manslaughter, it would be equally liable for the injury

actually suffered. *Banks* v. *Braman* (1905), 188 Mass. 367, 74 N. E. 594. It follows that the quality of the facts proved, as to their nature, either as criminal or *quasi-criminal*, may be best determined by a consideration of the authorities which would measure liability, had death resulted, as it wonderfully did not. The statute of Indiana defines manslaughter in the exact terms used by Blackstone in his definition of the common-law crime. *State* v. *Dorsey* (1889), 118 Ind. 167, 10 Am. St. 111.

It will not be necessary for the purposes of this case to inquire into the elements of any degree of homicide above that of manslaughter. Under our statute, a railroad engineer who carelessly runs his locomotive against a passenger-car standing upon the railroad track, thereby causing the death of a person in the car, is guilty of manslaughter. *State* v. *Dorsey, supra; Potter* v. *State* (1904), 162 Ind. 213, 64 L. R. A. 942; *Anderson* v. *State* (1889), 27 Tex. App. 177, 11 S. W. 33, 11 Am. St. 189, 3 L. R. A. 644. This is no more than an application of the doctrine that "a man may commit murder or manslaughter by doing otherwise lawful acts recklessly." *Commonwealth* v. *Pierce* (1884), 138 Mass. 165, 52 Am. Rep. 264, 5 Am. Crim. Rep. 391; *Commonwealth* v. *Hartwell* (1880), 128 Mass. 415, 35 Am. Rep. 391.

No form of statement can so clearly demonstrate the scope and effect of the doctrine as a brief resumé of facts somewhat analogous to those involved in the case at bar, which have been judged by the highest courts to come within the principle. "If anyone should drive so rapidly along a great thoroughfare leading to a large town, as to be unable to avoid running over any pedestrian who may happen to be in the middle of the road, it is that degree of negligence in the conduct of a horse and gig which amounts to an illegal act in the eye of the law; and if death ensues from the injuries then inflicted, the parties driving are guilty of manslaughter, even though considerable blame

may be attributed to the deceased." *Reg.* v. *Longbottom* (1849), 3 Cox C. C. 439, 1 Bennett & Heard, Lead. Cas. 66. "Prisoner indicted for manslaughter. The evidence was, that, being employed to drive a cart, he sat in the inside instead of attending at the horse's head, and while he was there sitting, the cart went over a child who was gathering up flowers in the road. Per Bagly, J. The prisoner, by being in the cart instead of at the horse's head, or by its side, was guilty of negligence; and, death having been caused by such negligence, he is guilty of manslaughter." *Knight's Case* (1828), 1 Lewin's Crown Cases 168.

"Being late for the train, Jackson was driving at a furious rate, at full gallop, and ran over a child going to school, and killed it. * * * If they [the jury] were of the opinion that the prisoners were driving at a dangerous pace in a culpably negligent manner, then they are guilty." *Reg.* v. *Kew & Jackson* (1872), 12 Cox C. C. 355.

In the case of *Queen* v. *Salmon* (1880), 6 Q. B. D. 79, 29 Wk. Rep. 246, Lord Colridge, C. J., said: "The conviction must be affirmed. If a person will, without taking proper precautions, do an act which is in itself dangerous, even though not an unlawful act in itself, and if in the course of it he kills another person, he does a criminal act which in law constitutes manslaughter."

A switchman carelessly failed to set a switch and thereby caused a loss of life. The supreme court of New Jersey, in affirming a conviction for manslaughter, said: "He owed a personal duty not only to his employers but to the public. He was found to have been grossly negligent in the performance of that duty, whereby human life was sacrificed. His conviction was right." *State* v. *O'Brien* (1867), 32 N. J. L. 169.

"If the defendant was unlawfully, wantonly, and recklessly driving upon the public highway, and thereby ran down and killed one who had a right to be there, the fact

that the defendant, when it was too late, tried to avoid the accident, would not excuse him." *State of Washington* v. *Stentz* (1903), 33 Wash. 444, 450, 74 Pac. 588. The defendant driving a team through the principal street of a town in a reckless manner, struck and fatally injured a woman who was attempting to cross the street. *People* v. *Pearne* (1897), 118 Cal. 154, 50 Pac. 376. A person driving a cart at an unusually rapid pace, drove over another who could not escape because of the rapidity of the driving. Held, manslaughter, although the defendant called to the deceased to get out of the way, and he might have done so had he not been drunk. *Rex* v. *Walker* (1826), 1 Car. & P. *320. A nearsighted man sat on the bottom of a cart and drove at night along the public highway at eight or ten miles an hour, and ran over and killed a footman. Held guilty of such carelessness as made the killing manslaughter. *Rex* v. *Grout* (1834), 6 Car. & P. *629. Neglecting to cover the mouth of a mine shaft because of which brick fell upon and killed a person below. *Reg.* v. *Hughes* (1857), 7 Cox C. C. 301. Negligence in the use of building material. *People* v. *Buddensieck* (1886), 103 N. Y. 487, 9 N. E. 44, 57 Am. Rep. 766. The cases according with *State* v. *Dorsey, supra,* are numerous. *Lee* v. *State* (1860), 1 Cold. (Tenn.) 62 (driving a hack against a child) ; *White* v. *State* (1887), 84 Ala. 421, 4 South. 598 (suddenly stopping a hand-car) ; *State* v. *Justus* (1884), 11 Ore. 178, 8 Pac. 337, 50 Am. Rep. 470 (shooting and killing another) ; *State* v. *Gilman* (1879), 69 Me. 163, 31 Am. Rep. 257 (shooting toward a crowd) ; *State* v. *Vance* (1864), 17 Iowa 138 (shooting and killing another).

The general rule deduced from the cases is that the negligent performance of a duty, or the negligent omission to perform a duty, is regarded as an unlawful act; and, if it results in homicide is homicide in the commission of an unlawful act for which the perpetrator is criminally liable.

Monographic note to *Johnson* v. *State* (1902), 61 L. R. A. 277, 299, subd. 10; Clark & Marshall, Crimes (2d ed.), §67; Kerr, Homicide, §157; 4 Blackstone's Comm., 191; 2 Bishop, Crim. Law (8th ed.), §659; 1 Wharton, Crim. Law (9th ed.), §§329, 336; 2 Wharton, Crim. Law (9th ed.), §§1563, 1567; *People* v. *Enoch* (1834), 13 Wend. 159; *United States* v. *Freeman* (1827), 4 Mason 505. These rules apply with full force to homicides resulting from the negligent management of locomotive engines, automobiles, bicycles, and other like dangerous agencies. The test of criminal liability lies in the negligent operation of the engine in view of all the conditions. *State* v. *Dorsey, supra; People* v. *Thompson* (1899), 122 Mich. 411, 81 N. W. 344; *Johnson* v. *State* (1902), 66 Ohio St. 59, 63 N. E. 607, 90 Am. St. 564, 61 L. R. A. 277, 281, note B. The defendant or its representative would therefore be guilty of manslaughter if the train which struck appellee's wagon was run, in view of the circumstances and facts shown, in a reckless manner and death had resulted.

The supreme court of Massachusetts has in some late and well-considered cases discussed the question of civil liability for wilful injury, and we quote from one of them as follows: "The law is regardful of human life and personal safety, and if one is grossly and wantonly reckless in exposing others to danger, it holds him to have intended the natural consequences of his act, and treats him as guilty of a wilful and intentional wrong. It is no defense to a charge of manslaughter, for the defendant to show that, while grossly reckless, he did not actually intend to cause the death of his victims. In these cases of personal injury there is a constructive intention as to the consequences, which, entering into the wilful, intentional act, the law imports to the offender and in this way a charge which otherwise would be mere negligence becomes, by reason of a reckless disregard of probable consequences, a wilful wrong. That this constructive intention to do an injury, in such cases, will be imported in the absence of an actual

intent to harm a particular person, is recognized as an elementary principle in criminal law. It is also recognized in civil action for recklessly and wantonly injuring others by carelessness." *Aiken* v. *Holyoke St. R. Co.* (1903), 184 Mass. 269, 68 N. E. 238. It is patent that if a railroad engineer should discover a person upon the track, evidently unable to escape therefrom, and should run him down, with knowledge of such conditions and with power not to do so, such conduct would not only furnish a basis for civil liability but for criminal liability of a higher grade than manslaughter, and no one can for a moment maintain that such a situation is the only one from which civil liability for wilfulness arises. It is not claimed in the case at bar that the appellant or its agents in charge of the engine saw appellee until the collision occurred, and no suggestion of an actual intent to kill or injure him is made, so that the verdict cannot rest upon an actual intent, as, of course, it might do if murder had been done.

Forty years ago the Supreme Court of Indiana, speaking by a judge who has had no superiors in strength of intellect and grace of diction, said: "It is well settled that where the negligence of the defendant is so gross as to imply a disregard of consequences, or a willingness to inflict the injury, the plaintiff may recover though he be a trespasser, or did not use ordinary care to avoid the injury. Recklessness in the management of the train is such gross negligence as is utterly regardless of consequences." *LaFayette, etc., R. Co.* v. *Adams* (1866), 26 Ind. 76, 78. "The injurious act or omission must have been purposely and intentionally committed, with a design to produce injury, or it must have been so committed under such circumstances as that its natural and probable consequence would be to produce injury to others. There must have been either an actual or a constructive intent to commit the injury." *Bell R., etc., Co.* v. *Mann* (1886), 107 Ind. 89, 93. See, also, *Louisville, etc., R. Co.* **v.** *Bryan* (1886), 107 Ind. 51;

*Pennsylvania Co.* v. *Sinclair* (1878), 62 Ind. 301, 306, 30 Am. Rep. 185; *Palmer* v. *Chicago, etc., R. Co.* (1887), 112 Ind. 250; *Louisville, etc., R. Co.* v. *Ader* (1887), 110 Ind. 376, 380; *Parker* v. *Pennsylvania Co.* (1893), 134 Ind. 673, 23 L. R. A. 552; *Conner* v. *Citizens St. R. Co.* (1896), 146 Ind. 430, 435; *Cleveland, etc., R. Co.* v. *Miller* (1898), 149 Ind. 490; *Cincinnati, etc., R. Co.* v. *Cooper* (1889), 120 Ind. 469, 474, 6 L. R. A. 241, 16 Am. St. 334; *Brannen* v. *Kokomo, etc., Gravel Road Co.* (1888), 115 Ind. 115, 7 Am. St. 411; *Gregory* v. *Cleveland, etc., R. Co.* (1887), 112 Ind. 385, 387; *Indianapolis St. R. Co.* v. *Taylor* (1902), 158 Ind. 274; *Brooks* v. *Pittsburgh, etc., R. Co.* (1902), 158 Ind. 62; *Union Traction Co.* v. *Lowe* (1903), 31 Ind. App. 336; *Overton* v. *Indiana, etc., R. Co.* (1891), 1 Ind. App. 436; *Barr* v. *Chicago, etc., R. Co.* (1894), 10 Ind. App. 433, 436; *Dull* v. *Cleveland, etc., R. Co.* (1899), 21 Ind. App. 571; *Pittsburgh, etc., R. Co.* v. *Judd* (1894), 10 Ind. App. 213, 222; *Louisville, etc., R. Co.* v. *Cronbach* (1895), 12 Ind. App. 666, 673; *Miller* v. *Miller* (1897), 17 Ind. App. 605; *Hancock* v. *Lake Erie, etc., R. Co.* (1898), 21 Ind. App. 10, 19; *Indianapolis, etc., R. Co.* v. *Petty* (1868), 30 Ind. 261; *Carter* v. *Louisville, etc., R. Co.* (1884), 98 Ind. 552, 556, 49 Am. Rep. 780; *Cincinnati, etc., R. Co.* v. *Cooper* (1889), 120 Ind. 469, 474, 6 L. R. A. 241, 16 Am. St. 334.

The question as to what is recklessness and what is due care, in a prosecution for involuntary manslaughter for killing another in doing a lawful act in an unlawful manner, is a question of fact for the jury. *Queen* v. *Cavendish* (1874), 8 Ir. Rep. C. L. 178; *People* v. *Thompson* (1899), 122 Mich. 411, 81 N. W. 344; *United States* v. *Taylor* (1851), 5 McLean 242, Fed. Cas. No. 16,441; *Rex* v. *Williamson* (1829), 3 Car. & P. *635; *Reg.* v. *Markuss* (1864), 4 F. & F. 356; *Rex* v. *Long* (1830), 4 Car. & P. *398; *Rex* v. *Spiller* (1832), 5 Car. & P. *333; *Commonwealth* v. *Pierce* (1884), 138 Mass. 165, 52 Am.

Rep. 264; *State* v. *Hardister* (1882), 38 Ark. 605, 42 Am. Rep. 5; *Rex* v. *Timmins* (1836), 7 Car. & P. (32 Eng. C. L.) *499. The collision complained of occurred at a public crossing, a place at which the obligations were mutual. " 'For, conceding that the railway train has the right of precedence of crossing, the parties are still on equal terms as to the exercise of care and diligence in regard to their relative duties.' " *Indianapolis, etc., R. Co.* v. *McLin* (1882), 82 Ind. 435, 448. And see *Pennsylvania Co.* v. *Krick* (1874), 47 Ind. 368, 371; *Chicago, etc., R. Co.* v. *Spilker* (1893), 134 Ind. 380, 400; *Lake Shore, etc., R. Co.* v. *McIntosh* (1895), 140 Ind. 261, 278; *Ohio, etc., R. Co.* v. *Walker* (1888), 113 Ind. 196, 197, 3 Am. St. 638; *Continental Improv. Co.* v. *Stead* (1877), 95 U. S. 161, 24 L. Ed. 403.

When a charge of wilful injury is supported by evidence, which is claimed to show recklessness, amounting to a constructive intent, in the operation of a railroad train, the question as to the existence of such recklessness and intent, depending upon facts never twice alike, is, both by analogy to the rule in manslaughter cases and upon principle, for the jury. *Barr* v. *Chicago, etc., R. Co.* (1894), 10 Ind. App. 433, 439; *Overton* v. *Indiana, etc., R. Co., supra; Memphis, etc., R. Co.* v. *Martin* (1897), 117 Ala. 367, 383, 23 South. 231; *Memphis, etc., R. Co.* v. *Martin* (1901), 131 Ala. 269, 30 South. 827; *Tennessee, etc., R. Co.* v. *Hansford* (1899), 125 Ala. 349, 365, 28 South. 45, 82 Am. St. 241; *Lake Shore, etc., R. Co.* v. *Bodemer* (1892), 139 Ill. 596, 29 N. E. 692, 32 Am. St. 218; *Southern R. Co.* v. *Drake* (1902), 107 Ill. App. 12. Thus it was said by the supreme court of Illinois, "that whether the defendant was guilty of wilful or wanton conduct * * * was purely a question of fact for the jury to determine from all the evidence, * * * and it was not the province of the court to inform the jury that some particular fact in the case was conclusive of that question. *Chicago, etc., R. Co.*

v. *Murowski* (1899), 179 Ill. 77, 80, 53 N. E. 572; *Illinois Cent. R. Co.* v. *Leiner* (1903), 202 Ill. 624, 629, 67 N. E. 398, 95 Am. St. 266; *Elgin, etc., R. Co.* v. *Duffy* (1901), 191 Ill. 489, 492, 61 N. E. 432; *East St. Louis, etc., R. Co.* v. *O'Hara* (1894), 150 Ill. 580, 37 N. E. 917. The Supreme Court of the United States, speaking by Justice Bradley, outlined the character of the duty to be observed at highway crossings as follows: "The train has the preference and right of way, but is bound to give due warning of its approach, so that the wagon may stop and allow it to pass, and to use every exertion to stop if the wagon is inevitably in the way. Such warning must be reasonable and timely. But what is reasonable and timely warning may depend on many circumstances. It cannot be such, if the speed of the train be so great as to render it unavailing. The explosion of a cannon may be said to be a warning of the coming shot; but the velocity of the latter generally outstrips the warning. The speed of a train at a crossing should not be so great as to render unavailing the warning of its whistle and bell; and this caution is especially applicable when their sound is obstructed by winds and other noises, and when intervening objects prevent those who are approaching the railroad from seeing a coming train. In such cases, if an unslackened speed is desirable, watchmen should be stationed at the crossing." *Continental Improv. Co.* v. *Stead, supra.* The appellee was not a trespasser, and the case is thereby differentiated to that extent from those in which the injured person was where he had no right to be.

Wilfulness, wanton negligence, wantonness, are terms used in many states without any clearly defined distinction, but are, generally speaking, regarded as equivalent and interchangeable, as will appear from reading the cases in which they are used. *Cleveland, etc., R. Co.* v. *Cline* (1903), 111 Ill. App. 416, 422. The following language used by the Alabama supreme court is peculiarly ap-

plicable to the case under consideration, on account of the
similarity of facts presented: "That the place where de-
ceased was struck, was a public crossing in the town of
Madison having a population of about five hundred people,
that this crossing was used more than any other in the town,
and that the average crossing during the day was about one
person in every ten minutes, and according to some of the
testimony, people crossed in 'great numbers.' A witness
could be required on cross-examination to define what was
intended by the terms 'frequently' and 'great numbers.'
The speed of the train at the time, according to the differ-
ent witnesses, ranged from eight miles to thirty miles per
hour. Assuming that the train was running at the speed
of thirty miles an hour, over a public crossing of the track
in a town of five hundred inhabitants, and that there was
an average crossing by the people of one person every ten
minutes, or in great numbers, facts known to the servants
in charge of the train, does the law declare that these facts
do not constitute wanton negligence, or is the question as to
whether these facts constitute wanton negligence one of
law and fact, properly referable to a jury for its determina-
tion ? * * * 'Precautionary requirements increase in
the ratio that danger becomes more threatening;' * * *
'the duty of care and vigilance becomes proportionately in-
creased according to the less or greater likelihood that there
are persons on the track at the time and place.' * * *
A train may be run under some circumstances over a public
crossing in a populous city at such speed as to amount to
that recklessness which is the equivalent to wantonness and
wilfulness. * * * Whether or not, therefore, the de-
fendant was guilty of wanton injury under the facts of the
case, should have been referred to the jury for its determi-
nation." *Memphis, etc., R. Co.* v. *Martin* (1897), 117
Ala. 367, 383, 23 South. 231; *Memphis, etc., R. Co.* v.
*Martin* (1901), 131 Ala. 269, 279, 30 South. 827; *Georgia
Pac. R. Co.* v. *Lee* (1890), 92 Ala. 262, 271, 9 South. 230;

*Haley* v. *Kansas City, etc., R. Co.* (1896), 113 Ala. 640, 21 South. 357; *Southern R. Co.* v. *Crenshaw* (1902), 136 Ala. 573, 583, 34 South. 913.

The doctrine of wilfulness arises in two aspects, the distinction between which has been clearly marked by the authorities heretofore cited, the one involving the actual knowledge on the part of the wrongdoer of actual peril in the particular instance, the other involving facts from which a willingness to inflict injury is implied from reckless indifference. Wilful and intentional wrong, that is a willingness to inflict injury, cannot be attributed to one who is without consciousness that his act or omission will or may probably lead to wrong and injury. Therefore, as a matter of pleading, wilfulness must be directly averred. It is well settled, however, as a matter of evidence, that the knowledge of danger upon which, in connection with the absence of subsequent diligence to avoid its consequences, a charge of wilfulness may be maintained, need not be that which is presently acquired through the physical senses. "The party charged need not, on the particular occasion see or hear, or through other sense become advised of the actual presence of every element necessary to constitute the danger that really exists. If * * * he knows of the crossing where people are wont to be in such numbers and with such frequency, a fact also known to him, as that to run a train along there with such great speed as not to be readily controlled, and which might not admit of the escape of persons crossing the track, his conduct, he having in mind that he was approaching such a place, would authorize the imputation of wantonness, wilfulness or reckless indifference to consequences, though in point of actual fact he did not in the particular instance know of the presence of persons in exposed positions." *Richmond, etc., R. Co.* v. *Greenwood* (1892), 99 Ala. 501, 513, 14 South. 495; *Alabama, etc., R. Co.* v. *Hall* (1894), 105 Ala. 599, 17 South. 176; *Georgia Pac. R. Co.* v. *Lee, supra; Louisville, etc.,*

*R. Co.* v. *Webb* (1893), 97 Ala. 308, 12 South. 374; *Highland, etc., R. Co.* v. *Robbins* (1899), 124 Ala. 113, 27 South. 422, 82 Am. St. 153; *East St. Louis, etc., Railway* v. *Snow* (1899), 88 Ill. App. 660; *East St. Louis, etc., R. Co.* v. *O'Hara* (1894), 150 Ill. 580, 37 N. E. 917; *O'Conner* v. *Illinois Cent. R. Co.* (1899), 77 Ill. App. 22, "It is not necessary, however, to show an intention, either actual or constructive, to commit the particular injury which resulted. It is enough to show that some injury to another or others would naturally and probably result from the act complained of." *Conner* v. *Citizens St. R. Co.* (1896), 146 Ind. 430, 436.

The standard by which recklessness in the doing of a lawful act is judged, is an external one of the conduct of a person of ordinary prudence in the same or similar circumstances. *Commonwealth* v. *Pierce, supra.* The act of the engineer in running the engine over the crossing in question at the speed and under the circumstances enumerated seems to have been done at the express instance of the appellant company, which made the schedule calling for the speed which the jury found to have been, in view of such conditions, recklessly excessive, and required him to conform thereto. The charge of wilfulness being made against appellant is supported not only by the evidence detailing the acts and omissions of its servants in charge of the engine, but by its own deliberate and premeditated course. This should lead to an affirmance of the judgment. There are certain considerations, however, supposed to have weighed against the finding, which, because of the insistence with which they are urged, deserve notice.

The presence of a railroad track is in itself a warning of danger, and that fact is usually sufficient to convict a traveler of contributory negligence in failing to observe precautions thereby suggested to him before undertaking to pass over such track. In the case under consideration, all questions of contributory negligence are eliminated, and the

effect of such warning, as it relates to the quality of appellant's acts, is alone involved. The presumption that one upon a railroad track will step aside and allow the train to pass is a reasonable one, and is founded upon the known instinct of self-preservation. *Nichols* v. *Baltimore, etc., R. Co.* (1904), 33 Ind. App. 229. In the case of one who drives along a highway, the question is whether the warning given by the mere presence of a railroad track before him, his view along said track being obstructed, and the sound of approaching trains being lessened, was sufficient to arouse the instinct of self-preservation and prevent his entering, not into a place of known peril, but into a place the peril of which he does not know, and to justify the other party in assuming that he has actual knowledge, and will, by virtue of the instinct of self-preservation, protect himself. The traveler is compelled to cross the tracks in proceeding along the highway, as he may lawfully do, and it is not dangerous to do so, except an engine be driven over it at the precise time. Remembering that the question of contributory negligence is eliminated, and that the obligations of the railroad company require it, in the exercise of ordinary care, to take precautions of an equally high grade as those exacted from a traveler, where the issue is one as to his contributory negligence, and that the right of precedence is dependent upon the giving of adequate warning, can it be said that a presumption arose in the case at bar, in the reliance of which the appellant might send its train with cannon-ball speed through the town and over the crossing without a possible imputation of negligence? A presumption, as the term is here used, is where a fact or set of facts is considered sufficient evidence of another fact, in the absence of evidence to the contrary, and presumptions of this nature are necessarily overcome by facts.

It has come to be a well-known fact—so well known as to be a matter of common knowledge—that the warning conveyed by a railroad track, an unobstructed view of it

being cut off, is not in itself sufficient to arouse the instinct of self-preservation, and that in spite of such warning a very large proportion of the traveling public come into the danger zone, many of them suffering no injury whatever, because of the accidental absence of juxtaposition between them and an engine, while many of them are killed or maimed by the collision occurring when a train does happen to reach them before they can escape, after actually discovering their peril. That such is the fact is disclosed by the records of the courts, by the decisions of this and the Supreme Court, by the records of the Interstate Commerce Commission, and by the great number of fatalities annually occurring and chronicled in the public press. Hardly a newspaper is printed that does not contain an account of some circumstance or casualty tending to emphasize the fact that to send a train of cars at such speed, over such a crossing as the one described, may be done only by one willing to injure or kill the unfortunates who do not get out of the way. It is true that every one who attempts to travel the street is not injured. Neither did the man in the cart run over everyone traveling on the street. It was the killing of the drunken man, who could not escape, which constituted manslaughter. Consequences must be probable. That is exactly what they must be. It is not necessary that they be certain. The meaning of the term in this connection is that the reasonably prudent, conscientious and careful man would feel inclined to believe that some one would be in the place of danger, and yet have room for hopeful doubt. The very doubt which lodged in the heart of the engineer made it possible for him to drive his engine and fulfill the schedule. The verdict says that such probability of injury did exist. This court takes the verdict as it is and is bound by it.

The negligent performance of a duty and the negligent omission to perform a duty, where they result in death, are equally the basis upon which a conviction for manslaughter

may depend. Monographic note to *Johnson* v. *State* (1902), 61 L. R. A. 277, 299, subd. 10. Whether the failure of the defendant to provide a watchman, gates, or other adequate protection, was negligence, or whether in their absence the running of a train in the manner and at the speed at which it is shown to have been done was negligence, in view of all the circumstances, and if so, whether such negligence was of so reckless a quality as to constitute wilfulness, were alike questions for the jury. "No court ought to say, as matter of law, with respect to a crossing located as this one was, in the heart of a city, on one of its thoroughfares, and with such surroundings as the evidence discloses, that a company maintaining such a crossing, discharges its full duty to the public, and is guilty of no negligence, although it fails to provide a watchman or gates to warn persons traveling in vehicles, of approaching trains." *Chicago, etc., R. Co.* v. *Kowalski* (1899), 92 Fed. 310, 34 C. C. A. 1. See, also, *Chicago, etc., R. Co.* v. *Netolicky* (1895), 67 Fed. 665, 14 C. C. A. 615; *Grand Trunk R. Co.* v. *Ives* (1891), 144 U. S. 408, 36 L. Ed. 485, 12 Sup. Ct. 679; *English* v. *Southern Pac. Co.* (1896), 13 Utah 407, 45 Pac. 47, 57 Am. St. 772, 35 L. R. A. 155. "The convenience of commerce" cannot be invoked to justify either manslaughter or wilfulness. "The value of human life cannot be overbalanced by any pecuniary or public interest. Our duty is simply to declare the law." *Memphis, etc., R. Co.* v. *Martin* (1897), 117 Ala. 367, 385, 23 South. 231. It is not lawful to take life to subserve the convenience of an individual. Neither is it lawful to take life for the convenience of a number of persons. If the convenience of commerce requires the operation of defendant's trains through Whiteland at sixty miles an hour, it may lawfully and properly so schedule and run them without liability to persons thereby injured or killed along the way, after, and only after, it has adequately guarded against collision and injury. An exemption from liability thus procured is one

which can be enforced without anæsthetizing the conscience of either jury or judge.

To exonerate from all liability a corporation which runs a railroad train over the streets and through the town at a rate so swift that its employes can only catch a glimpse of the white face of a sober traveler, who is whirled through the air as the engine passes, and at the same time hold a near-sighted man, driving a cart along a village street at eight miles an hour, guilty of manslaughter in running over a drunkard whom he did not see, evidences an acrobatic intellectual performance devoid of humanity and inconsistent with the instinct of civilization.

The judgment should be affirmed.

## ON PETITION FOR REHEARING.

ROBY, P. J.—The disposition of this appeal is not of great moment to the parties immediately concerned, and no further attention would be given to it if the principles involved were not of unusual importance. Those principles are not abstractly open to dispute, but abstract principle in itself avails nothing. It becomes potent only when correctly applied to facts coming within its reason, and therefore the problem which tries the patience and challenges the efforts of the courts is and must always be found in the application of principle to fact. All persons are equal before the law, and the sure guaranty of every man's right lies in the protection of the right of every other man; and the first and highest concern of the State, and therefore of its law, is for the lives and limbs of its citizens, not only for their good but for the good of the government which depends upon them.

Reference has been made, during the discussion growing out of this petition for rehearing, to "ancient cases dug up" for use in the dissenting opinion heretofore filed. The authorities therein cited speak for themselves. The writer believes that it is the duty of the courts to regard prece-

dents. Broadly speaking, they are expressive of the law as it is and ought to be. Innovations, created by unwise statutes or unjust decisions, mark the exception and not the rule. But, waiving the antique rules of the common law, let us consider, irrespective of precedent, historically and practically, the reason and sense of the situation.

When the country was new, its population sparse, its forests uncut, and its streams unbridged, the construction of a railroad was a great and difficult undertaking. They were then, as they are now, necessities. The development of that locality which was so fortunate as to be penetrated by a railroad was assured. Money was not plentiful, and the public built the railroads. Taxes were levied, subsidies voted, contributions made and grading and excavating was done gratuitously by the farmers along the line. Public-spirited citizens guaranteed the raising of stated amounts beyond the ability of the town to pay, and impoverished themselves in making good the guarantee; but the railroads were built, and the returns were so vast that the foreclosures and reorganizations, by which stocks and bonds issued to individuals and municipalities were wiped out, seemed of little importance. In that eager, hopeful, expanding day, the details of railroad construction and operation were crude. Parallel lines of iron rails reaching from Chicago to New York were the sole concern. They sprawled across the prairie, through the town, and into the city. Had they first been laid through a populous, compact and wealthy state, great care would naturally have been exercised from the beginning. They would have been fenced and guarded, overhead bridges and underground passageways would have been a first requisite. Railroads were not thus constructed in this country. Grade crossings were the rule, and the idea that any duty rested upon the company, except as tardy legislatures declared it, was not entertained. The citizen or the officer who at that time did anything to delay the rapid completion of these great public highways became

thereby "an enemy of the people." Legislatures were imbued with the spirit. *Terre Haute, etc., R. Co.* v. *State, ex rel.* (1902), 159 Ind. 438. The courts were kind to such corporations in many ways. *Columbus, etc., R. Co.* v. *Arnold* (1869), 31 Ind. 174, 99 Am. Dec. 615; *New York, etc., R. Co.* v. *Perriguey* (1894), 138 Ind. 414; *Terre Haute, etc., R. Co.* v. *Graham* (1884), 95 Ind. 286, 296, 48 Am. Rep. 719.

The doctrine of contributory negligence was speedily invoked to protect them from liability for damages on account of maiming or killing persons at highway crossings. For a long time such question was left to the jury, to be by it determined according to the standard of the conduct of a reasonably prudent man under the same or similar circumstances. *Ohio, etc., R. Co.* v. *Collarn* (1881), 73 Ind. 261, 270, 38 Am. Rep. 134. This standard was ultimately forsaken, and the courts prescribed the duty of a traveler exercising ordinary prudence. He must have looked both ways and listened attentively, and, if he could see, he was presumed to see, although he did not see, and, if he could not see, he was guilty of negligence for not getting out and going ahead until he could see, in the exercise of the "extraordinary care" which was now enjoined upon him. *Chicago, etc., R. Co.* v. *Thomas* (1900), 155 Ind. 634. The effect of the application of this doctrine was practically to exonerate the railroad company from liability in actions based on negligence, because of casualties occurring at highway crossings. There has been a slight tendency recently to mitigate the severity of the holdings (*Greenawaldt* v. *Lake Shore, etc., R. Co.* [1905], 165 Ind. 219); but in the main they are still enforced. The disregard of the rights and welfare of others by one person always arouses resentment against him, and such disregard on the part of such corporations, unchecked by the courts, has produced a result which might have been foreseen. Manifestations of such disregard are not confined to cases of the class under

consideration, but such cases are expressive of it. The average citizen, instead of regarding a railroad company with the kindliness that his father felt for it, has come to regard it as an enemy. Railroads are as beneficial and essential as they ever were, more greatly used, the public individually more dependent upon them, and their utility is more fully recognized than formerly. But their management has aroused a spirit of opposition, because of which the representatives of such companies who appear in court seem to have lost faith in the jury system, overlooking the fact that the vitality of that system lies in the disposition of common men to stand together against any influence which they regard as inimical. By the social compact members of society agree to be bound by the judgment of their peers, and corporations operating railroads form no exception to the rule. An individual who has come into such disfavor in his community as to be sent to the State's prison on less than legal evidence can recover its favor by changing his habits, and in no other way. It may be strictly legal for a railroad company to refuse to attempt to make any restitution to a person injured by it because his view of an approaching train was obscured by smoke (*Oleson* v. *Lake Shore, etc., R. Co.* [1896], 143 Ind. 405, 32 L. R. A. 149), but the occurrence seems to be distasteful to the average man, and, in order to overcome the impression such incidents produce, it may be necessary, among other things, to kill fewer people at grade crossings.

Another condition, which was not counted upon, exists. A modern railroad corporation is a money-making machine. It is within the protection of the law as a person, but it is a great deal more than a person. Its sole function is to make money. Its board of directors take no share of responsibility to themselves as individuals. They give only general orders, and are concerned only with results—with annual statements which show increased dividends. The superintendent obeys the general orders, and feels absolved

from responsibility for details necessary to carry them out. The engineer who loses a few minutes from the schedule finds a telegram at each station demanding why, and the necessity of daily bread drives him to take chances and make up time regardless of fog, or of the careless wayfarer who may be upon the track around the bend. This money-making machine is not concerned over the statute defining manslaughter. It has but one vulnerable point—it responds to but one sentiment. It will not continue that which costs it money and lowers dividends. If it is cheaper to kill twenty of its faithful employes, one at a time, than to build a new bridge, they will have to die. *Hollingsworth* v. *Chicago, etc., R. Co.* (1903), 160 Ind. 259; *Louisville, etc., R. Co.* v. *Wright* (1888), 115 Ind. 378, 7 Am. St. 432. If it is cheaper to build a bridge, a bridge will be built. If it will increase dividends to enforce temperance on the part of its employes, the corporation will at once take an advanced position upon the temperance question. Immunity from the payment of damages on account of grade-crossing accidents has probably had as much to do with the prevalence of such accidents as the increased rate at which it is possible to run a locomotive engine. Exemption from liability on account of such occurrences should logically follow from the precedent fact that the owners of the engine have taken every step which care and foresight could devise to guard the track. The exercise of care is the only foundation upon which such exemption can justly be placed. A human conscience could only justify its possessor in sending so dangerous a missile as a swiftly moving train through populous cities, country towns, and over highways, knowing the peril which it carries, by the reflection that nothing had been left undone to safeguard innocent persons who may be imperiled thereby.

The superstructure has been erected before the foundation was laid. The superstructure is exemption from liability on account of crossing accidents. The foundation

for such exemption, without which it has nothing to stand upon, is proof that the companies have done all that a reasonable man, owning such railroad, in view of his moral responsibility, ought to do to guard the track and thus avoid killing innocent persons, and that, too, without regard to thoughtlessness on their part, for it is as much a crime to kill a thoughtless as a thoughtful man. Nothing remains except to build the foundation now. Accidents such as the one complained of ought not much longer to be possible. The ingenuity which is expended in escaping liability for damages on account of them, otherwise directed, would devise appliances to protect every grade crossing. Overhead bridges, undergrade passageways, watchmen, and gates may be had at any time. It is not a question of expense, but of life. The public pay a price adequate to provide every possible safeguard, and no sound policy can be advanced for the exoneration of the management of the railroad from civil liability while such safeguards are lacking, and the assertion of the public's rights will surely cause them to be provided. The settled principles of the "ancient law" and of the modern law regarding wilful injuries are applicable to the servant (*State* v. *Dorsey* [1889], 118 Ind. 167, 10 Am. St. 111); why not to the master?

It seems to me that judges who have obligated themselves to administer justice, without regard to person, ought to hesitate a long time and have cogent cause before setting aside such judgment as that rendered by the trial court in this case; and, with great deference, I must respectfully submit that this petition should be granted, and such judgment affirmed.