## Southern Railway Company v. Emma D. Drake, Adm'x.

1. TRESPASSERS—*Who Are Not.*—Employes of a railroad contractor working on a passage track constructed on the right of way of a railroad company are not trespassers while leaving a dirt train on the passage track and crossing the main track, where the passage track was located by the railroad company for the contractor's use and such use was by the railroad's permission.

2. RAILROADS—*Duty Toward Licensees upon Its Premises.*—A railroad owes toward a licensee the duty of exercising reasonable care to prevent injuring him while upon its premises.

3. NEGLIGENCE—*Running a Train at a Speed Prohibited by Ordinance—Statutory Signals.*—If a train is run at a speed prohibited by ordinance or the signals required are not given, it is *prima facie* evidence of negligence.

4. SAME—*Degree of Negligence is a Question of Fact for the Jury.*—Whether negligence under the circumstances of a case is willful, is a question of fact for the jury.

5. VERDICTS—*General Verdict Applies to All the Counts of the Declaration.*—A general verdict is responsive to all the counts of the declaration and there is nothing to indicate upon what count it is based.

6. SAME—*Perjured Testimony is Ground for Setting Aside.*—Perjured testimony upon a material issue, where there is a sharp conflict of evidence, is a cause for setting aside a verdict.

Southern Ry. Co. v. Drake.

7. PROXIMATE CAUSE—*A Question of Fact.*—What was the proximate cause of an injury is a question of fact for the jury, under instructions of the court, as to what constitutes proximate cause.

8. INSTRUCTIONS—*Where the Evidence is Conflicting.*—In cases where the evidence is conflicting, the instructions should be accurate, and free from any tendency to confuse or mislead.

Trespass on the Case.—Death from negligent act. Appeal from the Circuit Court of Wabash County; the Hon. ENOCH E. NEWLIN, Judge presiding. Heard in this court at the August term, 1902. Reversed and remanded. Opinion filed March 2, 1903.

Suit to recover damages by appellee, widow and administratrix of Wm. M. Drake, who was killed on the evening of January 24, 1902, by appellant's locomotive, at Mt. Carmel station.

There are five counts in the declaration.

The first pleads an ordinance of the city of Mt. Carmel, which provides that the bell on locomotive engines shall be continuously rung while running within the corporate limits, and alleges that at the time in question the servants of appellant did not ring the bell, and in consequence thereof the deceased lost his life.

The second count pleads an ordinance of the city of Mt. Carmel which provides that a freight train shall not be run within the corporate limits at a greater rate of speed than six miles an hour, and alleges that the servants of appellant violated this ordinance, and in consequence thereof deceased lost his life.

The third count charges general negligence on the part of servants of appellant in running the freight train at the time in question, and that on account of such negligence, the deceased lost his life.

The fourth count alleges that the servants of appellant wantonly, negligently, willfully, recklessly and carelessly ran and drove the locomotive engine, without ringing the bell or sounding the whistle, and that by reason thereof the deceased lost his life.

The fifth count alleges that the locomotive engine, with a coal train, was standing still within the corporate limits of the city of Mt. Carmel, and that the servants of appel-

lant negligently, willfully and wantonly started up the engine without ringing the bell or sounding the whistle, and that by reason thereof the deceased lost his life.

To this declaration appellant filed the general issue. A trial was had by jury which resulted in a verdict in favor of plaintiff for $2,000, upon which verdict judgment was rendered and defendant appealed.

Plaintiff operated over this road a daily local freight train, known as No. 75, from Fairfield, Ill., east through Mt. Carmel, to Princeton, Indiana. At Mt. Carmel station, ten feet south of the main track, and parallel to it, was a side track, called the passage track, which connected with the main track east of the station, and also 700 feet west of it near a tank. South of the passage track was another side track known as the oil track. Streets crossed the track running north and south, the one on the east near the station, the one on the west, on the west side of the water tank. About 100 feet east of the station there was a switch track, called the butter-dish track, connecting with the main track and leading in a northeasterly direction.

McArthur Bros. were railroad contractors, using their own engines and dirt cars, and engaged in lowering appellant's track at Keyes Hill, two miles west of Mt. Carmel, using and hauling the dirt obtained there to elevate the track a mile east of Mt. Carmel. They had been employed at this special work two months. They had constructed the passage track at the place designated by appellant's engineer for their own use, stopping their construction train on it when at Mt. Carmel.

They employed a number of men who lived at Mt. Carmel and stayed there at night, being hauled from this station to and from their work.

These men took this construction train on this passage track in the morning, crossing the main track from McArthur's office, or from the station, to it, and left it in the evening when it ran on this track. McArthur Bros. had an office and an oil house on the north side of the main track between the station and the water tank on the west. The

servants of appellant were acquainted with the work being done by McArthur Bros., and the use made of the passage track.

On the evening of the accident, the local freight, No. 75, east-bound, due at Mt. Carmel at 4:30 P. M., was two hours late. It stopped west of Walnut street crossing, where the engine and three cars were detached and ran east to the tank and took water. McArthur Bros.' work train, consisting of an engine and seventeen dirt cars, was also some minutes late. It switched from the main track to the passage track east of the station, going west, about the time the engine of local No. 75 left the water tank going east, for the purpose of taking the butter-dish track east of the station. The engines of the two trains passed each other between the station and the tank. The rear cars of the dirt train were left a few feet east of the station. Just as it stopped, or was slowing to stop, some of the laborers, among them Drake, the deceased, left the train and started north to cross the main track. Two or three of them passed over safely just in front of the freight train. Drake in attempting to cross, was struck and killed. Two witnesses say that he slipped as he stepped from the north rail of the main track to the platform. Others say that he was struck between the rails when near the north rail. The night was growing dark and the engine of No. 75 had its headlight burning.

Edward C. Kramer and Green & Risley, attorneys for appellant; Alexander P. Humphrey, of counsel.

Landes & Kolb, attorneys for appellee.

Mr. Justice Worthington delivered the opinion of the court.

The passage track was constructed at the place designated by appellant's engineer, for the use of McArthur Bros.' dirt train, while working under their contract with appellant. Did this use include the stoppage of the train on the passage track, and the embarking and disembarking

of McArthur Bros.' laborers in the morning and in the evening? The depot platform and the office of McArthur Bros. were on the north side of the main track. The evidence tends to show that it was the habit of McArthur's laborers to take and leave the dirt train from their office. This involved crossing that track. The passage track having been located by appellant, and for the use of McArthur Bros., it is fair to infer that appellant knew how it would be used, and how it was used. If such use was by appellant's permission, it is clear that deceased, in crossing appellant's main track, was not a trespasser. Webster Mfg. Co. v. Mulvany, 68 Ill. App. 607; Barnum & Richardson Mfg. Co. v. Wagner, 64 Ill. App. 375. The deceased, then, was at least a licensee. It was for the jury, under all the circumstances in evidence, to say if he was not more than a mere licensee; that is to say, if he did not cross with such permission of appellant as amounted to an implied invitation to so cross. L. S. & M. S. Ry. Co. v. Bodemer, 139 Ill. 609; Hart v. Washington Park Club, 157 Ill. 9. In either relation, appellant owed the deceased the duty of exercising reasonable care to prevent injuring him while crossing its track.

The evidence tends also to prove that the servants operating the train No. 75 had a general knowledge of the use of the passage track. The conductor of No. 75, when walking from his engine at the water tank to the depot, knew the dirt train was coming on the passage track. The engineer, when at the tank, saw a train coming on the passage track, but testifies that he did not know what train it was. He also saw persons about the depot as he approached it, and saw two men crossing the track directly ahead of his engine when close by the depot, and saw two others draw back, who apparently had started to cross.

It is also in evidence that a switchman employed by McArthur's for that purpose signaled No. 75 when it was west of the water tank, that the dirt train was coming. The engine of No. 75, hauling three cars, after the signal was given, left the rest of the train and came to the tank

Southern Ry. Co. v. Drake.

and took water. Considering these facts as proved, it is evident that the question of the speed of No. 75, as it ran from the tank to the place where deceased was killed, and the question of giving the statutory signals and of ringing the bell continuously, as required by ordinance, are material questions. They are material in two views of the case.

First, if the speed was a rate per mile prohibited by ordinance, and the signals required were not given, or if one of these conditions existed, it was *prima facie* negli·gence on the part of appellant. T. P. & W. Ry. Co. v. Deacon, 63 Ill. 91; C. & N. W. Ry. Co. v. Smedley, 65 Ill. App. 644.

If such negligence, although not willful, was the proximate cause of the death of Drake, he exercising due care for his safety, appellant is liable and the judgment should be affirmed.

Second, if the required signals were not given, and the train was run at a prohibited and dangerous rate of speed, toward and by the depot, where persons were congregating and where others authorized to do so were in the act of crossing the track, or were visibly about to cross, these were facts, in connection with other evidence bearing on the situation, to be considered by the jury in passing upon the charge of willful, wanton and reckless negligence, as charged in the declaration.

As to the continuous ringing of the bell after leaving the water tank, and the speed of the train, the evidence is sharply and irreconcilably conflicting. There is, however, much difference in the opportunities of witnesses to know what were the facts in these respects owing to their respective locations and surroundings at the time. The fireman of No. 75 testifies that he was on the tender at the tank, managing the water spout; that when the engine left the tank he took his place on the left side of the cab and rang the bell continuously until the accident occurred. He also testifies, as does the engineer, that immediately after the man was struck, he said to the engineer, " Well, they can't say I was not ringing the bell." The two

brakemen, the engineer and the conductor of No. 75 also testify to the ringing of the bell after the fireman came from the tender to the engine. Nineteen witnesses testify that they did not hear the bell or whistle, and six of these say that they were giving attention to this, and that the bell was not rung nor the whistle sounded.

The engineer testifies that he turned on steam after taking water at the tank, but that after a speed of six miles was reached, some 150 or 200 feet from the tank, he shut off steam and rolled to the depot, slackening speed to four miles an hour; that he had been notified to take the butter-dish switch, which, from the evidence, appears to have been about 100 feet east of the depot. He is corroborated as to the rate of speed by the fireman and two brakeman. He is also corroborated by Wm. Hendrick, McArthur's day foreman, a witness called by appellee, and who was on the engine of the dirt train when it met No. 75 half way between the tank and the depot. He is also corroborated by Fisher, the conductor of the dirt train. Four witnesses for appellee fixed the rate of speed at ten miles an hour; four others at eight to ten; four others at eight. Alvis Moore, a witness whose deposition was taken by appellee, but was read by appellant, fixed the speed when the engine struck Drake, at from six to eight miles per hour.

A number of these witnesses were employes of McArthur Bros., and got off the dirt train just before, or were in the act of getting off at the time of the accident. It was growing dark, and according to some of these witnesses, steam was escaping from the cylinder on the left of the engine of No. 75, and also from the engine of the dirt train, and the engine of No. 75 was coming toward them as they started to cross the main track. Their ability to estimate speed under such circumstances, was an element for the jury to consider.

It is urged that the court erred in refusing to instruct the jury to disregard the fourth and fifth counts of the declaration, which counts charged willful negligence, upon

the ground that there is no evidence to sustain these counts. This involves an examination of the law and evidence that refer particularly to this claim of appellant.

Appellee's evidence, tested by the number of witnesses, preponderates upon the material allegation of the prohibited speed, and the allegation that the bell was continuously rung while running from the water tank to the depot.

Appellant cites decisions holding that the running of a train at a prohibited rate of speed does not, of itself, constitute willful negligence. Also that the failure to give required signals does not of itself constitute such negligence.

Decisions are to be read in the light of the facts in the cases in which they are rendered. The evidence in the cases cited differs from the evidence in the case at bar. Here it tends to prove both a prohibited rate of speed, and also failure to give required signals. This, too, under circumstances which made it important that the requirements of the ordinance, in both respects, should be obeyed. For these reasons it was proper to submit to the jury the issue of willful negligence, taking into consideration all the circumstances of the case. It was a question of fact for the jury to decide. C., B. & Q. R. R. Co. v. Murowski, 179 Ill. 80; L. S. & M. S. Ry. Co. v. Bodemer, *supra*.

In this latter case the court considers at some length what is necessary to constitute willful negligence, and answers the question, " what is meant by such gross negligence as constitutes willfulness," by saying, " it is such gross want of care and regard for the rights of others, as to justify the presumption of willfulness and wantonness." In the light of the decisions of these cases, we think there was evidence that warranted the submission of the issue of willful negligence to the jury, and that the court did not err in refusing to instruct the jury to disregard the fourth and fifth counts of the declaration.

The jury was instructed that the plaintiff could not recover under the first, second and third counts of the declaration, if the deceased was negligent, and such negligence

contributed to his death.   While not expressly so told, the jury was left to infer that the plaintiff might recover under the fourth or fifth count, charging willful negligence, if proved, although negligence of the deceased might have contributed to his death.

The jury returned a general verdict.   Such a verdict is responsive, and might apply to all the counts in the declaration.   Jernberg v. Mix, 199 Ill. 254.

It applies to the counts charging willful negligence, as well as to those alleging due care and caution.   There is nothing to indicate to this court upon what counts the verdict was based.   If it was apparent from the evidence that the deceased exercised due care and caution, we might assume that the verdict was based upon the counts alleging such care and caution.   But it is not apparent.   Such an assumption would therefore be unwarranted.   This makes it necessary to consider the case both upon the issue of willful negligence, and upon the issue of due care on the part of deceased.

If the jury found for plaintiff upon the issue of willful negligence, the question of the speed of the train was a very material question.   Bearing upon this question is the testimony of Bert Hollister, whose testimony is shown by affidavits not disputed, and corroborated by an indictment of the Wabash county grand jury, to have been willfully false.   He was a brother-in law of plaintiff.   It is proper to say that there is nothing before us to indicate that counsel for plaintiff, or that plaintiff herself was privy to this perjury.

Hollister testified that he had eight months' experience as head brakeman on the Lake Erie & Western; that he had been riding in the caboose of No. 75 before it came to the Walnut street crossing; that when it stopped there and the engine and three cars were detached, and went to the water tank, that he walked to the tank; that when the engine left the tank he climbed on the car back of the tender and rode to the west end of the platform; that they must have been coming eight or ten miles an hour, " fast enough

to throw me down when I got off;" that he did not fall down when he jumped off, but just came to one knee; that he walked over and saw the injured man and helped to take him out and carry him into the depot.

It is shown in affidavits filed in support of a new trial, that these statements of Hollister could not have been true; that at the time he claims to have been riding from the tank to the station, he was at the Williamson House in Mt. Carmel, eating his supper, and after supper was playing cards; that while there playing cards, a man came in and told of the accident, and that the name of the man killed was Drake; that Hollister asked if it was Bill Drake, and upon being told that it was, he replied, " My God! that is my brother-in-law."

It also appears from the affidavits of counsel for appellant that they did not know that the testimony of Hollister was false until after the evidence in the case was concluded; that they first learned of it from the state's attorney of Wabash county, who told them that he had reason to believe that Hollister had committed perjury, and that the matter was being investigated by the grand jury; that Hollister was a total stranger to counsel, and that they did not know that he was to be a witness until he was called.

It is impossible to tell what influence the testimony of Hollister as to the speed of the engine from the water tank to the platform, given with such particularity of detail, and stating his experience as a railroad man, may have had upon the jury. The speed at this place was a material issue bearing upon the general question of appellant's alleged negligence, and especially upon the issues of willful negligence.

Appellee may have been innocent in producing this testimony before the jury, but the question of innocence does not affect its influence upon the jury. It would be a dangerous precedent to hold that perjured testimony, especially that of a relative upon a material issue, where there is a sharp conflict of evidence, is not cause for setting aside a verdict.

In view of the probable influence of Hollister's testimony upon the allegation of willful negligence, considered in connection with the fact that for anything that appears in the record, the verdict may have been based upon the allegation of willful negligence, we think this issue should be submitted to another jury.

If it was apparent from the evidence that the deceased exercised due care, we might assume that the verdict was based upon this issue and the allegation of negligence as charged in the first three counts.   But it is not apparent. As the judgment must be reversed for the reason before stated, we make no comment upon the evidence bearing upon the question of due care, except to say that it does not justify us in assuming that upon this issue the jury found for appellee.

The first instruction given for appellee is not accurate, but the inaccuracy, of itself, is not reversible error, when the whole instruction is considered together.   The deceased had a right to presume, the ordinance being in evidence requiring it, that the bell would be continuously rung, and had the right to act upon that presumption, but not to the exclusion of reasonable care for his safety in other respects.

It is alleged that the court erred in giving the second instruction for plaintiff.   The instruction is as follows :

" If you believe from the preponderance of the evidence that the deceased, Wm. M. Drake, within the city of Mt. Carmel, was struck by the engine of defendant company, as alleged in the declaration in this case, as a result and in consequence of the negligence of the defendant, and that said Drake was not guilty of any negligence that was the proximate cause of his death, then you should find for the plaintiff."

This instruction was not calculated to enlighten the jury upon the issue of due care on the part of the deceased, but was calculated rather to mislead.   What was the proximate cause of the deceased's death was a question of fact for the jury, under instructions of the court as to what constitutes proximate cause.   The common acceptation of the term proximate, is next, nearest, immediate, direct.   In this

C. & E. I. R. R. Co. v. Burridge.

sense, the instruction is misleading, as the concussion of the engine was the immediate, direct cause of death.

Under the first, second and third counts of the declaration, plaintiff could not recover, if the deceased was negligent to a degree that contributed to his death, although the negligence may not, in the common acceptation of the term, have been the proximate, meaning the direct and immediate, cause of his death.   The jury may have understood from the instruction that the deceased was guilty of negligence, which in some way contributed to his death, and yet may have considered that such negligence was not the proximate cause of his death.

In all cases where the evidence is conflicting, instructions should be accurate, and free from any tendency to confuse or mislead.

For the reasons given, the judgment of the Circuit Court is reversed and the cause remanded.