## Hudson S. Robbins, Appellee, v. Illinois Power & Light Corporation, Appellant.

### Gen. No. 8,317.

Opinion filed
October 23, 1929.

H. M. STEELY and H. M. STEELY, JR., for appellant; HERBERT HAASE. of counsel.

HUTTON & CLARK, for appellee.

MR. JUSTICE SHURTLEFF delivered the opinion of the court.

Appellee recovered a judgment for the sum of $246.30 against the appellant in the circuit court of Vermilion county as damages to appellee's motor vehicle, claimed to have been caused in a collision between said vehicle and appellant's motor bus, growing out of the negligence of appellant's driver. There were five counts in the declaration, the first count charging general negligence on the part of appellant's driver

and that the motor bus of appellant "then and there ran, struck and collided with great force and violence upon and against the automobile of plaintiff." The second count sets out a portion of an ordinance of the City of Danville providing:

"Furthermore, vehicles turning to the left into another street, shall give the right of way to vehicles traveling the street into which the same are turning," and that appellant's driver, in violation of the provisions of said ordinance, negligently and carelessly caused said vehicles to collide, etc., and injured appellee's machine. The third count is based upon the same ordinance and charges that appellant did wilfully and wantonly turn said motor bus, under his control, with intentional disregard of his duty in that behalf and disregard of the consequences to persons lawfully using the intersection of said streets, to the left from Gilbert Street upon Winter Avenue, at said intersection, etc., without giving appellee the right of way, etc., thereby causing the injury, etc. The first additional count is based upon the statute, providing among other things: that any person operating a motor vehicle at the intersection of highways shall keep to the right of the center of such intersection when turning to the right, and pass to the right of the center of such intersection when turning to the left, and that appellant's driver carelessly and negligently violated the provisions of this ordinance, thus causing the injury. The second additional count is based upon a further provision of the ordinance that: "Vehicles turning to the left into an intersecting street shall continue beyond the center of the street intersection before turning. The driver must signal with the hand and incline to the left to permit overtaking vehicles to pass on the right," and that appellant's driver negligently violated this provision of the ordinance, causing injury, etc.

· The ordinance contained the provision and definition that a street was that part of a public highway intended for vehicles, and that the term "vehicles" should include motor vehicles. Each count except the third avers due care and caution on the part of appellee. There was a demurrer to each count of the declaration, which was overruled and a plea of the general issue by appellant.

Gilbert Street in the City of Danville is an arterial highway, with a 25-foot pavement to a curb, running north and south into Winter Avenue, but does not go through. Winter Avenue is an east and west street with a 24-foot pavement, without curb, which intersects with Gilbert Street. Winter Avenue for about 200 feet west from Gilbert Street was a little down grade. Appellee, with his two brothers, a little before 7 o'clock in the morning, was driving east on Winter Avenue towards Gilbert Street, and appellant's bus was proceeding north on Gilbert Street at about the same time. In the southwest corner of the intersection of Winter Avenue and Gilbert Street there is a telephone pole and a fire plug. The pole is four or five feet south of the slab on Winter Avenue, and is about the same distance west of the paving on Gilbert Street. Winter Avenue and Gilbert Street are each paved with cement. In the southwest corner of the intersection there are two houses situated about 25 feet from the streets.

The case for appellee is stated as strongly as it can be stated in appellee's testimony, as follows:. "As to what happened, I came up the Denmark Hill, turned to the left—there was a little rise there—and when I was about 300 feet west of Gilbert Street, driving east, I saw the bus coming. I saw it before it came in behind the house on the corner, but it wasn't going at any excessive rate of speed. Neither was I. I intended to be going slow enough to stop if necessary. I thought

I would stop or get out of the way. The bus was going north on Gilbert Street and I expect it was about 300 feet south of Winter Avenue when I saw it. I saw the bus when it came out upon Winter Avenue. I was on the right hand side of the street, and just as it came out from behind the house, it decreased its speed. It cut over about 25 feet south of Winter Avenue. The windows were frosted with ice and it was very cold that morning. I intended to stop at Gilbert Street, or intended to be going slow enough to have the car under control. The bus came out of Gilbert Street and pulled directly across the pavement on the west side of Gilbert Street. There was only one thing to do, and that was put on the brakes. I put on the brakes and the front end of the car did not collide with the bus but the back end did. There was a little ice there. After the collision a window was broken. The bus was going north on Gilbert Street, and then turned to the left, facing to the northwest. I know where the intersection of those two streets was. The bus when it turned and came upon Winter Avenue was west of the intersection of the two streets. I haven't measured the width of the bus but I would judge it was about nine feet wide, and it is about twenty feet long and about eight feet high. When the bus came over on the west side or left to the center, it stopped with the front end of the bus past the west side of the center line about ten feet. It stopped before I hit into it. When the bus stopped and I hit it, the rear end of the bus or both back wheels were south of the center line of Winter Avenue. When the collision occurred the rear end of the bus was about four feet north of the south line of the Winter Avenue pavement. I have ridden on trains and driven automobiles, and have a judgment as to rate of speed. When the bus turned off Gilbert Street upon Winter Avenue, my judgment would be it was going fifteen miles per hour, and before that I was

going at a speed of about between ten and fifteen miles
an hour. When the bus stopped, I wasn't ten feet
from it.

"My car was equipped with brakes, and they were
in good working order and worked that morning. I
put on the brakes and it was icy and threw the car side-
ways. The front end of my car never touched the bus.
It was the side of both vehicles that collided. The
headlights in front were not damaged. When I put
on the brakes, the rear end of my car turned to the
north. I saw that all avenues of escape were closed
and my car collided with the bus. There was a fire
plug about five or six feet south of the telephone pole
that I have spoken of and when I put on the brake, the
telephone pole was about ten feet from the front end
of our car to the southeast. When I put on the brakes
I tried to turn down Gilbert Street behind the bus.
There was a space of five or six feet between the
rear end of the bus and the curb on the west side of
Gilbert Street and it was not enough space to go
through.

"The collision did not have any effect on the bus.
I rode the bus down town. When my car hit the bus,
both vehicles slid two or three feet and the bus slid
east and a little back north, and then the bus stopped,
and I got out. It was a big yellow bus with windows
in the upper half and the operator in front on the left
side. There were windows entirely around the front.
I observed the windows on the left side of the bus.
. . . It was very cold that morning. The windows
with exception of a space possibly eight inches around
where the windshield wiper had worked were frozen
over and there was no place where the driver could see
outside. The only vision the driver had was directly
in front."

The driver of the bus gave his version of the acci-
dent in the following testimony: "I live at 619 North

Franklin Street and am in the employ of the Illinois Power & Light Corporation; have been working for them about seven and one half years as a street car operator and bus operator. I have been operating a bus about seventeen months. I have also driven an automobile.

"On January 2nd I was driving bus No. 107 on the North Gilbert and Junction line. On the trip out that morning just preceding this accident, I left the Square in Danville at 6:45 a. m. and arrived at the intersection of Winter Avenue and Gilbert Streets about one minute to or seven o'clock a. m. I was on time. Going north on that bus I was sitting on the left in the front end. That bus projects out in front of the windshield in front of me, I expect four and one-half feet. As I measured it the bus is 22½ feet long and 8 feet wide.

"As I went north on Gilbert Street approaching Winter Avenue for the last fifty or sixty feet before reaching the south line of Winter Avenue, my speed was probably ten miles an hour. I was running on the east side of Gilbert Street. I did not at any time before reaching the south line of Winter Avenue turn over to the west side of Gilbert Street. When I entered into Winter Avenue, I was running about five miles an hour. I didn't see anything approaching from the west when I went by the Brooks' house. I first saw it just beyond Swallow's gate, and at that time the motor bus was just ready to take the intersection, and the automobile was approximately 225 feet west. I saw him coming, and I had started and was taking the street. He was coming so fast that he couldn't turn on that side because he was past the center of the street to the north, and I shot the bus as fast as it would go on across the street, with both wheels off the pavement. He was traveling mostly on the north side of the street. That morning the street

had snow on it and where the traffic was, it was packed just like ice. At the time the automobile struck the motor bus I was standing still with both front wheels off the pavement, and the bus headed to the northwest, standing northwest to southeast. The automobile struck the motor bus just in front of the rear wheel, on the left side, and as near as I could tell it broke the beam there where it received the impact; also broke two of the projections which come between the windows, and one window glass at the top. It slid the bus about three feet. Mr. Horner was up there with me afterwards and saw the tracks made at the time I went off on the north side. At the time the automobile hit the motor bus, it was traveling between 15 and 20 miles an hour. Previous to that time or when I first saw it, it was probably going 35 miles an hour, and he was traveling mostly on the north side of the slab. Where it hit the bus in front of the rear wheels that part of the bus was probably two feet north of the center line of Winter Avenue. I have been turning in that intersection for 17 months. The width of the paved slab on Winter Avenue is 24 feet and the width on Gilbert Street is 30 feet. I know where the pole stands at the southwest corner of the intersection, but not by measurement. It is about 5½ feet from the slab on Winter Avenue, and the hydrant is about 10 feet south of the pole.

"The windshield wiper of that bus is on the outside. The windows on the left side were frosted but the windshield was clear. The reason it did not frost was that the heat from the motor keeps the steam from people's breath away from it. When I stopped with the front wheels off the north side of the slab the rear wheels would be about even with the west line of Gilbert Street, and the front wheels would be to the west of that. There has been no change out there as to buildings, slab, pavements, curb lines, trees, hydrants, etc.,

between the time of the accident and now. It is in the same condition. I did not shift gears as I approached the south line of Winter Avenue, or from the south line of Winter Avenue and starting around the corner. I turned to the left. In turning, the front wheels of the bus were just about the center of the intersection of Winter Avenue and Gilbert Street.

"When I stopped my rear wheels were just a little west of the center of the intersection of the two streets. They were north and west. The rear wheels had been just to the west of the intersection of those two streets. I saw Mr. Robbins coming about 225 feet west of Gilbert Street. I wasn't south of Winter Avenue when I saw him. I was starting on the intersection of Winter Avenue when I saw him coming 225 feet away. My front wheels were just about the intersection of Winter Avenue, practically six feet south of the slab on Winter Avenue and I was then going about five miles an hour. I had started to head the bus northwest and I could see him. You can always see up west when approaching that street.

"Q. How many feet back of Gilbert Street was he as you came up to Winter Avenue?

"A. Fifty feet.

"I looked to see, and the reason I didn't see him was he wasn't there. He was down the hill toward Logan Avenue. When I was 50 feet off, on Gilbert Street, I looked to the northwest and he wasn't there. I went on the the 50 feet. He was driving straddling the center line in Winter Avenue; if anything he was a little more to the north than to the south. There was snow on the pavement and snow on the ground. I saw the snow there as I was coming up, could see it plainly. I knew it was very slippery. When I first saw him he was coming about 30 or 35 miles an hour. I was taking the street on Winter Avenue when I first saw him, and on taking that slab I was going about

five miles an hour. I looked to the northwest about 200 feet south of the intersection and I didn't see this car. Looking across to the northwest 150 feet south of those houses you can't see two hundred feet west of Swallow's gate; you can't see past the gate. There is no view of Logan Avenue. I didn't see Mr. Robbins at Swallow's gate when I was back of the Brooks' house.''

The driver also testified that on a dry pavement he could stop his bus in six feet, running at five miles per hour; that he could not do that on a slippery pavement as the bus would skid, and for that reason he slowed down.

He further testified: ''When I came to Winter Avenue I didn't see Mr. Robbins. He wasn't there. When you look past that house south of Winter Avenue 50 feet you can see just about even with Swallow's gate. I was looking.

''Q. Instead of turning to the left when Robbins came toward the bus, why didn't you turn the bus around to the east?

''A. It is contrary to the rules of the company. I never even thought of turning it to the east.

''I have been driving 17 months. I have seen cars skid. I came up toward Winter Avenue at ten miles an hour, and when I was close I slacked down to five miles an hour. Back about 50 or 75 feet I was going about ten miles, and I was going five miles when I started across the street. My seat in the front end of the bus I should judge was about 5½ feet from the front end. When I saw Mr. Robbins I went across the street as fast as the bus would go. Five miles an hour was as much as it would go under those conditions. It takes time to pick up speed. It is easier to stop a car than it is to increase the speed.''

The driver testified, and it was not disputed, that the bus was standing still when the car of appellee hit the

bus. He further testified that he expected he had traveled with the back end of the bus to the left of the center of the streets, and with the front end clear over on the north side, at five miles an hour.

Appellee further testified: "I was about three hundred feet west of the intersection of these streets to the best of my knowledge when I saw the bus coming into Winter Avenue. When I first saw the bus turning into Winter Avenue, I was only back about twenty feet. The bus stopped after it crossed on Winter Avenue. It was stopped when I hit it. When it stopped I was about ten feet from it. I don't know whether the front wheels of the bus were off the paved slab to the north when it stopped or not; I didn't notice. As to whether when my automobile hit the bus it shoved the rear end of the bus to the east I am not sure. I think it did."

Appellee's brother Lawrence, sitting on the front seat with appellee, first saw the bus about 700 feet south of the street intersection and at that time he testifies appellee was about 350 feet west of the intersection, driving at the rate of 12 to 14 miles per hour, and that the bus was traveling 20 to 25 miles per hour; that he saw the bus about 60 feet south of the intersection, and he further testifies that "when he came into the intersection of Winter Avenue, he was probably four or five feet from the curb on the west side of Gilbert Street. He cut the corner and turned to the left sort of "catty-corner." The motor bus was headed northwest and the back end was southeast, and the back end of the bus was not over four feet from the south edge of Winter Avenue and was past the west or left hand side of Gilbert Street where he cut across the corner and before he came across the street. He shot directly across the street and instead of crossing the pavement and getting out of the way, the front wheels of the motor bus were across the center mark of Win-

ter Avenue. The bus stopped there and at that time we were about 15 feet west of the bus.''

Appellant's testimony was corroborated by proof that shortly after the accident the bus tracks were shown to be in line with the west curb of Gilbert Street, where the right front wheel of the vehicle was north of the paving on Winter Avenue four feet and the left front wheel just north of the pavement. The pavement was very icy and slippery. There is no proof that the driver of the bus at any time saw appellee until he came to the intersection. It was appellee's purpose to turn south into Gilbert Street, the main thoroughfare into Danville, where appellee and his brother were expected to commence their work at 7 o'clock.

At the close of plaintiff's case and again at the close of all the testimony appellant presented its motion with an instruction as to each count in the declaration, asking the court to instruct the jury to find a verdict for appellant. The court denied each motion and refused each instruction. There was a motion for a new trial which was overruled and a motion in arrest of judgment, which was denied and judgment entered and appellant has brought the record to this court for review.

Various assignments of error are made. There is a variance in the proofs from the allegations in the first count of the declaration. The automobile of appellee struck the bus of appellant after the bus had come to a stop, and this count in the declaration, upon appellant's motion, should have been withdrawn from the consideration of the jury. (*Buckley v. Mandel Bros.*, 333 Ill. 368.)

It is contended by appellant that the provision of the ordinance set out in the second and third counts of the declaration as quoted: ''Furthermore, vehicles turning to the left into another street, shall give the right of way to vehicles traveling the street into which the same are turning,'' is in direct conflict with the

provisions of section 33 of the Motor Vehicles Act, Cahill's St. ch. 95a, ¶ 34, which provides:

"Except as hereinafter provided motor vehicles traveling upon public highways shall give the right of way to vehicles approaching along intersecting highways from the right and shall have the right of way over those approaching from the left."

By section 26 of the Motor Vehicles Act, Cahill's St. ch. 95a, ¶ 27, it is provided that all ordinances of cities and villages in respect to or limiting the speed of motor vehicles or motor bicycles shall be of no validity or effect, etc.; "provided, that nothing in this Act contained shall be construed as affecting the power of municipal corporations to make and enforce ordinances, rules and regulations affecting motor trucks and motor driven commercial vehicles used within their limits for public hire, or from making and enforcing reasonable traffic and other regulations except as to rates of speed not inconsistent with the provisions hereof." This provision of the statute has been construed by the court in *City of Chicago v. Francis,* 262 Ill. 331, 335, in which the court held: "The question in this case is whether the city of Chicago can compel, by ordinance, the owner of a motor vehicle, other than a motor truck or motor-driven commercial vehicle, to display thereon any other number than the number of the registration seal issued by the Secretary of State. The present statute expressly provides, 'nor shall such owner be required to display upon his motor vehicle or motor bicycle *any other number* than the number of the registration seal issued by the Secretary of State.' The ordinance in question makes it unlawful for any person to use *any* vehicle upon the streets of the city of Chicago unless a metal plate is affixed *bearing a number* issued by the city clerk of the city of Chicago. The ordinance is squarely in conflict with the State law, and must therefore be held invalid and

void unless within some of the provisos. It is apparent from this law that the General Assembly by the revision of the law in 1911, and having in mind the court decisions of recent years which we have cited, intended to take certain matters in regard to the control of motor vehicles entirely out of the hands of municipal authorities. As said in *Ayres v. City of Chicago, supra:* 'It is a fact within the common knowledge of most persons that automobiles, other than those used in particular localities for hire, are extensively used in this State in making tours of considerable distance, in the course of which many cities, villages and towns would be visited. . . . Clearly, the purpose of the legislature was to pass a new and complete law designed to take the place of all municipal ordinances or rules regulating the equipment and operation of motor vehicles.' This condition is becoming more apparent each year with the extended use of motor vehicles and the long distances traveled by them in short periods of time, hence the urgent need of a general law which would apply to the whole State, so that laws concerning motor vehicles being propelled about the State should not be left to the ordinances of each individual village or city in the State. The latter course would lead to confusion and in some cases to injustice. Almost any owner of a motor vehicle or motorcycle will frequently pass through several cities or villages in the course of a few hours. If the city of Chicago can compel the owner of an automobile to affix the tag of that municipality, every other city and village in the State can by ordinance do likewise. The legislature evidently had this in mind, as well as other matters which would lead to confusion unless corrected, when the law of 1911 was passed. The exception, from the law, of motor trucks and motor-driven commercial vehicles, which would necessarily be used locally, emphasizes the intent of the law in regard to motor vehicles like the one used by plaintiff in error in this case. It is

undoubtedly necessary for municipalities to establish and enforce traffic regulations, and the reasonableness of municipal ordinances enforcing such regulations would depend upon the circumstances and conditions in such municipalities. Under the law a municipality may make and enforce reasonable traffic and *other* regulations, except as to rate of speed, *not inconsistent with* the provisions of the State law regulating the use of motor vehicles when conditions warrant them."

This case has been followed by *Roe v. City of Jacksonville,* 319 Ill. 215, 217; *Elie v. Adams Express Co.,* 300 Ill. 340, 343, and *City of Lincoln v. Dehner,* 268 Ill. 175, 182, so that it has become the settled law of this State that cities and villages cannot, by ordinance, adopt traffic regulations generally applicable to motor vehicles that contravene the statutes of this State. Nothing is shown indicating that the ordinance in question was intended to apply only to motor trucks and motor driven commercial vehicles, etc. It purports to be a general ordinance as to motor vehicles. Appellee cites *Pettit v. Weil-McLain Co.,* 252 Ill. App. 423, but nothing in that case has any bearing upon the provisions of the ordinance set out in the second and third counts of the declaration. The court should have withdrawn the second and third counts of the declaration from the consideration of the jury. As to the third count, it may be added that there is no proof in this record that would warrant the submission of this count charging a wilful and wanton injury to the jury, and it was error to submit this issue to the jury. The fact that the declaration may have contained one other good count charging negligence, does not cure the error or tend to support the verdict. The counts are not of the same class and do not charge the same or a similar offense. In addition to what this court said in *Grinestaff v. New York Cent. R. R. Co.,* 253 Ill. App. 589, it may be suggested that a "cause of action" is the wrongful act, neglect or default causing death, and not

merely the death itself. (*Scharfenstein v. Forest City Knitting Co.,* 253 Ill. App. 190; *Mooney v. City of Chicago,* 239 Ill. 414, 423; *Crane v. Chicago & W. I. R. Co.,* 233 Ill. 259, 262.) If issues are made upon all the counts in suit, including one of which malice is the gist, a judgment upon a general verdict is responsive to such issues and prima facie establishes that malice was the gist of the action. (*Jernberg v. Mix,* 199 Ill. 254; *Southern Ry. Co. v. Drake,* 107 Ill. App. 12, 20; *Matter of Hinson,* 162 Ill. App. 121, 122; *West Side Bank of Evansville v. Parr,* 219 Ill. App. 545, 547.) An act based upon negligence and carelessness and one based upon wilfulness and wantonness are independent and diverse causes of action and proceed from different principles, as set out by Mr. Justice Cartwright in *Illinois Cent. R. Co. v. Eicher,* 202 Ill. 556, 563: "It is urged that the case was tried and submitted to the jury on the part of the defendant upon the question of wilful or wanton injury, and therefore it cannot complain of the reference to the declaration. It is true that after the refusal of the court to direct a verdict, general instructions were asked by the defendant, and given, requiring proof of a wilful or wanton injury; but these could not remedy the effect of the instructions authorizing a verdict of guilty upon proof of mere negligence. The instructions are in irreconcilable conflict, and do not present any harmonious view of the law." (45 Corpus Juris 672.) A declaration may contain counts for common negligence, also for a wilful and wanton injury. Likewise a declaration may contain counts charging a cause of action under the federal Employers Liability Act, a count under a State statute and counts charging common law liability. (*Hunt v. Illinois So. Ry. Co.,* 196 Ill. App. 539; *Mitchell v. Louisville & N. R. Co.,* 194 Ill. App. 77, and *Patry v. Chicago & W. I. R. Co.,* 265 Ill. 310.) The counts in these cases set out independent and diverse causes of action. The nature of the proofs under one count

could not establish a cause of action under the other. In *Illinois Cent. R. Co. v. Eicher, supra,* the court held that the proofs submitted could not have constituted negligence imposing liability, and that the failure of the court to withdraw the issue from the jury constituted error, and the cause was reversed and remanded. In *Hunt v. Illinois So. Ry. Co., supra,* there were counts based upon the common-law duty of defendant and a third count based upon a statute of the State of Missouri, and other counts based upon the Federal statute as to safety appliances. The court held:

"The argument of appellee that a verdict will not be set aside if supported by one good count does not apply, especially when the court gave an instruction for appellee based upon the Missouri statute and directing a verdict which under the admitted facts was error. Exceptions were duly preserved to the giving of this instruction and assigned as error in the motion for new trial. (*Patry v. Chicago & W. I. R. Co.,* 265 Ill. 310.)"

In *Mitchell v. Louisville & N. R. Co., supra,* a similar situation arose and the court held:

"There was no disputed facts in evidence and no room for two conclusions from those facts under the law as declared in the case of *Illinois Cent. R. Co. v. Behrens, supra.* The request for the peremptory instruction raised the question as one of law and should have been given. *Patry v. Chicago & W. I. R. Co.,* 265 Ill. 310."

In *Patry v. Chicago & W. I. R. Co., supra,* there were counts based upon the federal Employers' Liability Act and counts based upon the common-law liability. Defendant's counsel had asked the court to instruct the jury to find for the defendant as to the counts charging liability under the federal Employers' Liability Act, and it was held that the question as to whether there was any legal evidence to sustain the claim that the parties were engaged in interstate com-

merce was thus preserved as a question of law. The court held:

"It is argued on behalf of the appellant that if the judgment could not be sustained under the Employers' Liability act the Appellate Court should have remanded the cause for a new trial on the common law counts. Since the court properly held there was no liability under the Employers' Liability act as a matter of law, the judgment would properly be reversed, so far as that issue was concerned, without remandment. The Appellate Court has no authority to make a finding of facts unless it finds the facts in whole or in part different from the finding of the trial court. (*Treat v. Merchants' Life Ass'n,* 198 Ill. 431.) The verdict apparently was based upon the Employers' Liability act, for the jury found, in answer to special interrogatories, that both the appellant and the appellee were at the time of the accident engaged in inter-State commerce. This finding precluded any liability under the common law counts, and the other findings of fact in answer to the special interrogatories are not such that the judgment of the jury as to whether the appellant was guilty of contributory negligence or not can be ascertained. There was a general verdict of guilty. If this referred to the common law counts, alone, it implied a finding that the appellant was not guilty of contributory negligence, but if it referred to the inter-State commerce counts it did not. There is a finding that it was the appellant's duty to look out for signals to transmit them to the engineer, but no finding that he was guilty of negligence which contributed to his injury."

In all of these cases, including *Grinestaff v. New York Cent. R. Co., supra,* where there are counts in the declaration of an independent nature, varying in the form of liability, a request for a peremptory instruction to direct a verdict for the defendant presents a

question of law as to there being any evidence in the record in support of a verdict, and the doctrine that a verdict may be supported by one good count does not apply, especially in those cases where an issue is submitted to the jury that is without evidence to support it. For this added reason the consideration of the third count should have been withdrawn from the jury.

As to the second and third additional counts, appellant raises the question of a variance. Each count charges that appellant, by its servant, "did drive and propel its said motor bus, . . . and with great force and violence, ran, struck and collided with, upon and against said certain automobile, then and there being so driven by plaintiff," etc. The proofs show that at the time of the accident appellant's motor bus was standing still and that appellee's automobile ran into the bus. It is contended by appellant, under the rule laid down in *Buckley v. Mandel Bros., supra,* that this constitutes a variance. Appellee cites *Taylor v. Wheelock,* 249 Ill. App. 152, 155. In this case the court say: "In the first place, it is not charged in the declaration that the train ran into and collided with the automobile. The language used in the declaration is that 'the said engine and train were brought into violent collision with the said automobile.' The common definition of the word 'collision,' as generally understood, is a violent contact between two objects. All that the expression used in the declaration means is that the engine and train and automobile were brought into violent contact with each other, which allegation was fully sustained by the proofs."

In the case at bar the charge, stripped of all possible surplusage, is: "Appellant *did drive* and *propel its motor bus* and *with great force and violence collided with said automobile.* This is not a charge that the vehicles were brought into collision. The word "col-

lided'' being preceded by and subjected to the words ''did drive and propel'' and the words, ''with great force and violence,'' plainly modifies the word ''collided'' to mean the same as ''ran'' and ''struck'' and brings the charge squarely within the rule laid down in *Buckley v. Mandel Bros., supra.* This is not the way the accident happened and the proofs do not support such charge. Otherwise the first additional count and the proofs offered under it, raise the issue squarely as to whether appellant did violate the statute, and whether such negligence, if any, was the proximate cause of the injury to appellee's car. The first additional count charges a violation of the statute. The proofs do not support the charge. The second additional count charges a violation of the city ordinances as follows: ''Vehicles turning to the left into an intersecting street shall continue beyond the center of the street intersection before turning. The driver must signal with the hand and incline to the left to permit overtaking vehicles to pass on the right.'' The last clause in the ordinance would in no manner affect the parties to this suit. It was shown that the paving width on Winter Avenue was 24 feet, 12 feet north of the center of the intersection; that the length of the bus was 24 feet and 8 inches; the width 7 feet and 6 inches and the height 9 feet. Appellant offered to prove that it was not a physical possibility to drive the bus past the center of the intersection before turning, and then to make the turn. This the court refused to admit. This was error. The facts, if shown, would have a direct bearing upon the question as to the reasonableness of the ordinance. The bus was permitted to use the roads and streets by the State commerce commission. The city council of Danville is not warranted in legislating against such use. If Gilbert Street was an arterial highway, appellee, if in the exercise of due care, should have stopped his car at the

west line of the street. That he was not able to stop his car on an incline by reason of the ice and snow and very slippery condition of the roadway does not render appellant guilty of negligence. From the view we take of the case, it will not be necessary to notice other errors pointed out. From the errors pointed out the judgment of the circuit court of Vermilion county should be and is reversed with a finding of fact to be incorporated with and as a part of the judgment.

*Reversed with finding of fact.*

We find as a fact that the appellant or its driver was not guilty of any negligent act, as charged in the declaration.